465 S.E.2d 841

**STEPHEN L.H., Plaintiff Below, Appellee,**

v.

**SHERRY L.H., Defendant Below, Appellant.**

No. 22084.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 18, 1995.

Decided March 6, 1995.

Dissenting Opinion of Chief Justice Neely March 8, 1995.

Concurring Opinion of Justice Workman July 24, 1995.

Suzanne W. Daugherty and George A. Daugherty, Elkview, for Appellee.

Steven L. Miller, Miller & Reed, L.C., Cross Lanes, for Appellant.

CLECKLEY, Justice:

The primary issue in this case is whether the circuit court employed the correct standard of review when it entered its own findings of fact and conclusions of law that were contrary to those of the family law master. The facts of the case provide the appropriate opportunity to discuss and develop more fully the standard of review a circuit court must apply in reviewing the findings and ultimate decision of a family law master.

### I.

### JURISDICTION

Because there are still aspects of this case pending in the circuit court, we first examine *sua sponte* whether we have jurisdiction over this appeal. Under W.Va.Code, 58–5–1 (1925), this Court has appellate juris-

diction over final decisions and judgment orders issued by a circuit court. We recently defined a "final judgment" as contemplated by this statute as a decision that ends the litigation on the merits and leaves nothing for the circuit court to do but execute the judgment. Syl. pt. 3, *James M.B. v. Carolyn M.*, 193 W.Va. 289, 456 S.E.2d 16 (1995).

■ The circuit court's decision to overturn the findings of the family law master was indeed a big part of the ongoing child visitation proceedings, but the court never addressed the issue of attorney fees that were also being sought by the defendant below and appellant herein, Sherry H.[1] This context, however, does not automatically divest us of jurisdiction. Although this Court has strictly applied the "final judgment" rule, we have stated that if we can determine from the record what the circuit court meant to do and its reasons, the record may be sufficient to permit the appeal to proceed. In this context, the intention of the circuit court is controlling. *See Vaughn v. Mobil Oil Exploration and Producing Southeast, Inc.*, 891 F.2d 1195 (5th Cir.1990). In addressing the finality requirement, we said in *Strahin v. Lantz*, 193 W.Va. 285, 286 n. 1, 456 S.E.2d 12, 13 n. 1 (1995), "we adopt a practical interpretation that looks to the intention of the circuit court."

It is obvious that the circuit court felt the attorney fee issue was moot when it set aside the family law master's findings and entered its own findings in favor of the plaintiff below and appellee herein, Stephen H. From this perspective, the ruling of the circuit court can be viewed as settling all issues of the proceedings. Specifically, we find review of the circuit court's order is appropriate, as it appears it intended to dispose of the entire case. Accordingly, the order in question is final, and this Court has appellate jurisdiction. Because we have decided to reverse the judgment of the circuit court and reinstate the family law master's findings, upon

remand, the circuit court should reconsider the issue of attorney fees.

## II.

## BACKGROUND

We begin by noting that our review of this voluminous record developed before the family law master has been extensive. This Court has examined the entire record, including videotapes containing portions of the family law master hearings and interviews of the child witnesses, and briefs of the parties.

The record reveals Stephen H. and Sherry H. were married in August of 1984. Their daughters Ashley and Chelsey were born in December of 1985 and March of 1988, respectively. Sherry H. moved out of the marital home with her daughters in 1988, and the parties were divorced in June of 1989.

Sherry H., the primary caretaker, was granted custody of the children. It is undisputed that she allowed Stephen H. liberal visitation privileges beyond those granted in the divorce order. Apparently, for vindictive reasons, Stephen H. on some occasions did not take advantage of the scheduled weekend visits with the children. Notwithstanding these incidents, it appears the visitation arrangements were amicable.

Numerous witnesses described the children as happy little girls who were intelligent for their ages. Ashley was characterized as truthful; no witness testified that she was prone to fabricate a lie.

During the summer of 1989, the girls spent a week with Stephen H. It was after this visit that Ashley first complained to Sherry H. that her daddy had pulled her underpants down and inappropriately touched her. Ashley demonstrated the touch to her mother by pointing to her vagina. Sherry H. talked with her daughter about what had happened, but did not act immediately. Sherry H. told

---

1. We follow our traditional practice in cases which involve sensitive facts and do not use the last names of the parties so as not to stigmatize them or their children. *See, e.g., Nancy Viola R.* *v. Randolph W.*, 177 W.Va. 710, 356 S.E.2d 464 (1987); *West Virginia Dept. of Human Services v. La Rea Ann C.L.*, 175 W.Va. 330, 332 S.E.2d 632 (1985).

her sister, Barbara B., that she was afraid Stephen H. had sexually abused the girls. During this same time period, Ashley also relayed to Barbara B. what she told her mother.

Sherry H. planned to ask the girls' physician, Dr. John Kelly, about her suspicions during their next appointment. Dr. Kelly examined Ashley in June of 1989. No physical evidence of abuse was found, but Dr. Kelly informed Sherry H. that she should consult with a child psychologist if she suspected child abuse. Sherry H. failed to pursue the matter any further until the following summer.

In the summer of 1990, Ashley's behavior changed significantly. She was very reluctant to go with her father and began having nightmares. Sherry H. arranged for Ashley to talk to a clinical psychologist, Linda Workman. Ms. Workman met with Ashley on July 19, 1990; August 1, 1990; and September 19, 1990, and with Ashley and Chelsey together on August 22, 1990. After these interviews, Ms. Workman notified Sherry H. that she believed Ashley was being truthful and had been molested by her father. Based on this information, Sherry H. petitioned for modification of visitation.

At the September 20, 1990, hearing before the family law master, Stephen H.'s motion for the children to be examined by independent experts was granted. He suggested the experts and arranged for the interviews with Dr. Kathleen Preville, Assistant Professor of Pediatrics, West Virginia University at the Charleston Division, and Pam Rockwell, a sexual abuse counselor.

Based upon a physical examination of the girls, Dr. Preville testified that Chelsey's examination was normal. The findings of Ashley's examination were basically inconclusive. Ashley's hymenal opening was larger by one standard deviation than the average size for her age. Dr. Preville testified that the evidence would be consistent with digitalization. However, on cross examination, she admitted the size was still within normal ranges. Furthermore, Ashley's labial tissues were fused

at birth and required treatment by medication to mature fully, and this treatment could not be ruled out as a factor causing the slight deviation.

Ms. Rockwell interviewed Ashley on October 10, 1990; October 22, 1990; and November 8, 1990; and videotaped an interview conducted on November 13, 1990. Anatomically correct dolls were used to help Ashley explain what she remembered. Ashley, pointing to the area between her legs, demonstrated to Ms. Rockwell where she was touched by her father. She indicated that no one other than her father had touched her in that area of her body. Ashley also said her father touched Chelsey the same way, and this event occurred in the bedroom of his house. Ms. Rockwell testified that based on these interviews, she believed both Ashley and Chelsey were sexually abused by Stephen H. Ms. Rockwell further testified it was impossible to believe a four-year-old would fabricate these allegations.

Sherry H. testified that Ashley was particularly reluctant to go with her father during Thanksgiving visitation of 1990. Two day-care workers testified they were unaware of the abuse allegations at that time, but they noticed significant changes in both the girls' behavior after the Thanksgiving visit with Stephen H. Ashley was withdrawn from her peers, became uncharacteristically physically abusive, and wanted to be held by the day-care workers. Chelsey cried and wanted to be rocked and soothed by the day-care workers. The girls exhibited unusual behavior up until the facility closed in December of 1990.

Stephen H. emphatically denied sexually abusing his daughters. He attributed their change in behavior to their examinations by Dr. Preville and Ms. Rockwell in November of 1990. He believed it was abnormal for such young children to undergo a vaginal examination. Furthermore, he believed that Sherry H. and her sister, Barbara B., coached Ashley into saying the abuse occurred. To illustrate this point, he described an event that took place in December of 1990 when he and his mother picked the girls up

in his car to take them for a visit. Sherry H. and her sister met them at an Exxon Station in Cross Lanes. After the girls got into the car and they drove down the road a little ways, he playfully pinched Chelsey on the leg. (It was common for him to do this in a fun-loving way and call them little monsters). However, this time Chelsey got a funny look on her face and looked at Ashley and said "Daddy touched me." He stated that Sherry H. and her sister have somehow convinced the children that any time he touches them, it is a bad touch.

When questioned about his wife's motives, Stephen H. responded she was a very vindictive person. He admitted it would be against Sherry H.'s pecuniary interests to see him lose his license to practice dentistry or to be indicted on these charges. He also admitted that Sherry H. had already obtained full custody of the children before these allegations arose. However, he believed she brought these charges in hopes that he would drop the petition he filed in February of 1990 requesting a reduction in the amount of child support he had to pay.[2]

Stephen H. called an expert witness on his behalf, Dr. Richard Gardner, a psychiatrist and professor at Columbia University College of Physicians and Surgeons, Division of Child Psychiatry. Dr. Gardner has written textbooks and articles on the topic of child sexual abuse allegations. At the May 16, 1991, hearing, Dr. Gardner testified he interviewed Stephen H. at length, reviewed the transcripts of the witnesses who testified at the earlier hearings, analyzed the videotaped interview of the girls, reviewed the doctors' reports submitted in the case, and observed the testimony of Sherry H. on the day he testified. Dr. Gardner opined that based on his extensive review of the evidence in this case, Stephen H. did not sexually abuse Ashley or Chelsey. He also stated that Stephen H. did not possess any of the some twenty-five indicators of personality traits consistent with being a pedophile.

During his testimony, Dr. Gardner critiqued the videotaped interview of the children performed by Ms. Rockwell. Being highly critical of Ms. Rockwell's interview techniques, he stated the leading nature of the questions implanted a visual image to Ashley that was not reality and that Ms. Rockwell's subsequent questioning reinforced the positive responses to familiar questions. He characterized her use of anatomically correct dolls in the interviews as sexual abuse in and of themselves. Dr. Gardner believed Ashley's testimony was contaminated by repeated and improper interview techniques to the point she was no longer a credible witness.

Dr. Gardner testified he would have preferred to have met with the children and their mother, but Sherry H. would not submit to an examination or allow her children to be interviewed. Dr. Gardner opined that Sherry H.'s "exclusionary maneuvers" in the way she left her husband and excluded the girls from seeing their paternal grandmother and other friends and the fact she had been sexually abused as a child would militate toward a false or delusional accusation.

### III.

### FAMILY LAW MASTER'S FINDINGS

After hearing the evidence above, the family law master issued 111 findings of fact. In addition to enumerating the findings of fact, factual conclusions and "ultimate facts" were included in her findings. The family law master found Ashley's allegations were true:

"2. The Court finds that Ashley [H.] was telling the truth when she told, first her mother, Sherry [H.], Petitioner herein, then her mother's sister, Babs [B.], in the

---

**2.** This matter was brought before a different family law master, and the record of those proceedings is not available for review. It appears that Stephen H. was required to make monthly payments of $900 for child support and he also paid approximately $350 per month for a car payment to Sherry H. He petitioned for recalculation of his obligation because of a reduction in his income. Although relevant, the parties did not offer evidence on the final resolution of this matter.

summer and fall of 1989, then continued complaining to her mother until July of 1990, and then later told psychologist Linda Workman in August 1990, and later to Pam Rockwell in October 1990, that her father, Stephen L.[H.], had sexually molested her. This finding is based not only upon the testimony and credibility of these witnesses as more fully described hereinbelow, but also upon the testimony of Petitioner's and Respondent's lay witnesses: particularly Respondent's mother, Edith [A.]; Respondent's friends, Steve and Nancy [F.]; Respondent's witnesses, former ex-babysitters Donna [H.] and Barbara [D.]; and Tom [M.], all of whom, having had ample opportunity to observe, described Ashley [H.] as intelligent, mature for her age, and truthful."

It was the determination of the family law master that Sherry H. was a credible witness and did not coach Ashley into making the allegations of abuse. While the family law master noted the evidence regarding the alleged financial motivation of Sherry H. to falsely accuse her former husband, she found the rehabilitation evidence more persuasive.[3] Furthermore, the family law master found Sherry H. was not pursuing these allegations for improper motives.[4]

The family law master found the expert testimony of Ms. Rockwell, Ms. Workman, and Dr. Preville to be credible and convincing.[5] Dr. Gardner's opinions, however, were

3. In assigning reasons for the finding that Sherry H. was credible, the family law master found the allegations that she had financial motivation to fabricate these charges against Stephen H. incredible because she was aware of the implications that these "allegations could result in the loss to her of a significant amount of child support, not to mention extensive legal fees and the expense of this lengthy litigation which has caused her to miss several days of work." Also, the family law master found the other allegation that Sherry H. was motivated to lie in order to exclude her daughters from visitation with their father was also not credible because she already had sole custody of her daughters and could relocate them in another state if she wished without the approval of Stephen H. Also as Stephen H. and his own witnesses, baby-sitter Donna [H.], and his mother Edith [A.], agreed, she had allowed more frequent visitation than their divorce order required and furthermore had voluntarily agreed to more extensive visitation than that recommended by the West Virginia Department of Human Services in its visitation guidelines with regard to children under three years old in order to give the father increased overnight visitation rights with Chelsey.

More significantly, the family law master found Sherry H.'s credibility was further enhanced because

"she at first did not want to believe her daughter, delayed for almost a year in taking any action until she began to worry because the child's behavior had changed sufficiently towards visitations with Respondent that Sherry [H.] began to believe that something must have happened. Only then on July 19, 1990 did she take her daughter who was then four and one half years old, to a clinical psychologist, Linda Workman, who was initially engaged according to both Ms. Workman and the Petitioner specifically to determine whether, in Ms.

Workman's professional opinion, the events described by Ashley had actually occurred; furthermore, notwithstanding Petitioner's concerns, she still allowed her two daughters to accompany the Respondent and his mother Edith [A.] to the beach in August of 1990 because Ms. Workman's evaluation was incomplete; only after Ms. Workman's third session with Ashley and Chelsey on August 22 at which Ashley described in detail what had happened and Ms. Workman expressed her opinion that Ashley was telling the truth, did Petitioner file her Petition requesting Modification of Visitation[.]"

4. The family law master observed that Stephen H. and all the other witnesses agreed that despite evidence of severed friendships and strained relationships with his family, Sherry H. did not exclude him from his children until after she finally came to believe Ashley's allegations of sexual abuse.

5. In reviewing the testimony, the family law master noted that in Ms. Rockwell's professional opinion

"Ashley [H.] was telling the truth and that both Ashley and Chelsey [H.] had been sexually abused by their father, Stephen L. [H.,] ... that children are incapable of this kind of fabrication at the age of four, and although suggestible, cannot sustain a series of lies without detection; that contact between an alleged perpetrator and child victim can be coercive and is not the best way to arrive at the truth; that the best test is to interview the child and rely upon the experience and training of the evaluator[.]"

Additionally, the family law master found Linda Workman to be "a qualified psychologist who had ample opportunity to observe Ashley [H.]" and that her expert testimony was "credible and

given little weight.[6]

The family law master outlined Stephen H.'s testimony and characterized it as not credible. The family law master stated "except for his firm denial that he molested his daughters, [his testimony was] evasive, argumentative, peculiar, and generally not credible; furthermore, his inartful attempts to plug incongruent evidence of Petitioner's motivations, and Ms. Rockwell's videotape into his expert's theories are obvious and further reduce his credibility." Stephen H.'s conduct during the hearings before the family law master was also criticized.[7]

Accordingly, the family law master found Stephen H. sexually molested Ashley "on several occasions" and "probably" molested Chelsey between the summer of 1989 and 1990. She recommended that visitation with Stephen H. be terminated until he satisfactorily completes psychological treatment. The family law master also recommended that Stephen H. pay for the cost of the psychiatric treatment for the girls, the cost of the proceedings, and Sherry H.'s attorney fees.

## IV.

## CIRCUIT COURT'S FINDINGS

The circuit court reviewed the findings of fact submitted by the family law master, the transcripts of the hearings, and the videotapes of the proceedings and of the girls' interview. The circuit court specifically rejected "each and every finding of fact and conclusion of law" as presented by the family law master and issued its own findings.

Unlike the family law master, the circuit court was impressed by Dr. Gardner, and

---

convincing." The family law master made similar findings as to Pam Rockwell. While not expressly endorsing the methodology employed by Ms. Rockwell during her videotaped interview with the children, the family law master did "not find the questions or methodology sufficiently leading or suggestive to invalidate the truthfulness of Ashley's answers which were basically consistent with the child's claims made for over a year prior thereto to other credible witnesses, therefore, the Court finds Ms. Rockwell's professional opinion credible and convincing, and the videotape to be convincing confirmation of Ashley [H.]'s prior allegations, and of the probability of Chelsey [H.]'s sexual abuse."

Finally, the family law master found that Dr. Preville "testified that Chelsey's physical examination was normal; that Ashley [H.]'s genitalia exam was abnormal, in that Ashley's hymenal opening was larger by one standard deviation than the average for her age of four years and eleven months old; that there was no evidence of penal penetration, but that this enlarged hymenal opening was consistent with digitalization (the insertion of a finger); and that therefore, it was her expert opinion to a reasonable degree of medical probability that Ashley [H.] had been sexually abused." The family law master found that Dr. Preville's testimony was "corroborative of Ashley [H.]'s allegations that ... Stephen [H.] penetrated her with his fingers, especially in light of the evidence that Ashley [H.] is quite small for her age and therefore could be expected to have a smaller hymenal opening than average[.]"

6. Although the family law master found Dr. Gardner to be "highly qualified, erudite, enter-

taining and profound, possessed of a healthy ego, and ... many of his theories reasonable; some of his criticisms of 'the system' and common methodology used in cases of this sort seems well taken," the family law master accorded little weight to his opinions on the ultimate issues. It was found that most of Dr. Gardner's testimony concerning Sherry H., for example that she had engaged in exclusionary maneuvers, was based, not on the evidence of record, but upon what Stephen H.'s attorney had told him. Dr. Gardner admitted that "'... if I were to separate myself from what Mr. Daugherty is saying,' his opinion would change." After discussing several problems with his testimony, it was concluded that Dr. Gardner's opinion was entitled to little weight because his ultimate decision was based on a relatively brief interview with Stephen [H.] and it was a purely subjective measure unlike the MMPI or similar standardized personality tests.

7. The family law master found Stephen H's

"demeanor throughout these hearings surprisingly inappropriate and domineering considering the seriousness of Ashley's charges and the demonstrated competence and diligence of his several attorneys, during which the Respondent alternately glared or laughed at the Petitioner and her counsel and made sarcastic noises and rude, deprecatory gestures during the testimony of witnesses which behavior is not reflected on the record[.]"

found his testimony persuasive.[8] The circuit court discussed articles written by experts in the area of child interview techniques, particularly in the context of child sexual abuse situations. Based on the literature reviewed, the circuit court determined the family law master's finding that the interview techniques used were not "sufficiently leading or suggestive to invalidate the truthfulness of Ashley's answers" was plainly wrong. The circuit court found that "[e]ven a cursory examination of the available literature reveals that the statements of Linda Workman concerning suggestibility and those of Pam Rockwell concerning fabrication are wrong."

The circuit court agreed with Dr. Gardner's criticisms of how Ashley was interviewed. It relied on these conclusions to find the reports of Ashley's abuse were not credible, Ms. Workman and Ms. Rockwell's opinions were not credible, and Dr. Preville's report illustrated a lack of physical evidence of abuse. Therefore, the circuit court found the allegations against Stephen H. were not substantiated.[9]

The circuit court declined to address what factors lead to the motivation of Sherry H. to pursue what it believed to be fabricated charges:

"Much has been made by all parties to this action about the presence or absence of motivational factors on the part of Sherry [H.] That is not for this Court to determine. Even if such a determination were to be made it would be mere speculation and certainly could not be used as a basis for determining whether or not sexual abuse occurred. Therefore, this Court will not address the issues of motivation but rather leave them to be debated by the experts such as Dr. Gardner."

In response to the family law master's finding of fact No. 61, which concerned Stephen H.'s exhibition of certain pedophilic indicators, the circuit court discounted her findings. However, the circuit court did agree with the family law master that Stephen H.'s conduct during the hearing was less than ideal: "This Court must admit that Dr. [H] did not make the best of witnesses. His evasive, argumentative answers did nothing to help his case. Yet, this Court must not let that interfere with its consideration of Dr. [H.]'s firm, adamant denial of abusing his children."

Based on its conclusion that Stephen H. did not sexually abuse Ashley or Chelsey, the circuit court ordered Stephen H.'s visitation rights reinstated. The circuit court requested the parties to provide written proposals of how to best reunite Stephen H. with his

8. The circuit court made the following finding as to Dr. Gardner:

"While the Law Master accorded little weight to the testimony and opinions of Dr. Gardner this Court was quite impressed with his training, experience, knowledge of this case and his opinions. In this vein the Law Master stated that she found 'it of no probative value that Respondent's expert, Dr. Gardner, is more impressively credentialed than psychologist Workman or Pamela Rockwell; the Court's decision is based upon the totality of the evidence and not merely upon expert opinion, otherwise the battle of credentials would reduce the fact finding of this Court to mere confirmation of the position of the litigant which could afford to find and hire the 'fastest gun' or the most impressive expert.

"Obviously, a Court must consider the totality of the evidence in reaching a decision but it cannot ignore the relative training and expertise levels of those experts providing the testimony. To do otherwise, as suggested by the Law Master, would obviate the need for expert testimony and would place one with a B.S. Degree and no further training on the same level with one who possessed a Doctorate and had years of research and practical training and experience."

9. The circuit court made the following conclusion as to the allegations against Stephen H.:

"In light of the foregoing, the 'disclosures' to Pam Rockwell and her testimony thereon, are found by this Court to be unreliable, of no credibility and will not be used by this Court to make a finding of sexual abuse by Stephen [H.]

"Once Pam Rockwell's testimony is found lacking the testimony of Linda Workman and Dr. Kathleen Preville must also be found to lack credibility. Both Dr. Preville's and Workman's testimony as to abuse having been perpetrated by Stephen [H.] is predicated upon the 'disclosures' to Rockwell. The 'disclosures' having been found to lack credibility, the testimony of Dr. Preville and Linda Workman is also found to lack credibility and be unreliable."

daughters "with the least amount of emotional and psychological trauma to all parties involved in this action."

## V.

### STANDARD OF REVIEW

 This case presents the question of whether the circuit court violated W.Va. Code, 48A–4–20(c) (1993),[10] when it conducted a *de novo* review of the findings of fact made by the family law master. We hold that the standard of review for a circuit court is controlled by the aforementioned statute and that a circuit court should review findings of fact made by a family law master only under a "clearly erroneous" standard, and it should review the application of law to the facts under an "abuse of discretion" standard.[11]

Our conclusion with regard to the appropriate standard of review that should be applied to findings of fact made by a family law master is supported by precedent and reasonable statutory construction. In *State ex rel. Dillon v. Egnor,* 188 W.Va. 221, 226, 423

S.E.2d 624, 629 (1992), *quoting State ex rel. Sullivan v. Watt,* 187 W.Va. 447, 453, 419 S.E.2d 708, 714 (1992), Justice Miller, writing for a unanimous Court, explicitly stated that " 'the circuit court does not act *de novo,* but reviews the findings of fact and conclusions of law made by the family law master.' " Thus, this Court clearly has recognized the limited "appellate" role of a circuit court in reviewing the findings of fact of a family law master.

In both *Dillon* and *Sullivan,* this Court gave elaborate instructions regarding the role of a family law master in developing a record. Significantly, in *Dillon,* immediately after we remarked that a circuit court should not give *de novo* review to findings of fact, we detailed the fact-finding responsibilities of a family law master by stating: "Clearly, in order for the circuit court to fulfill its function, the recommended order must contain a concise and complete statement of findings of fact and conclusions of law, the reasons therefor, and the appropriate disposition of the case[.]" 188 W.Va. at 226, 423 S.E.2d at 629. These fact-finding responsibilities of a family law master and the review of a circuit court are statutorily mandated.

10. In 1993, the Legislature amended and reenacted W.Va.Code, 48A–4–10, as W.Va.Code, 48A–4–20. W.Va.Code, 48A–4–20, is substantially similar to W.Va.Code, 48A–4–10 (1990). W.Va. Code, 48A–4–20(c), provides:

"(c) The circuit court shall examine the recommended order of the master, along with the findings and conclusions of the master, and may enter the recommended order, may recommit the case, with instructions, for further hearing before the master or may, in its discretion, enter an order upon different terms, as the ends of justice may require. The circuit court shall not follow the recommendation, findings and conclusions of a master found to be:

"(1) Arbitrary, capricious, an abuse of discretion or otherwise not in conformance with the law;

"(2) Contrary to constitutional right, power, privilege or immunity;

"(3) In excess of statutory jurisdiction, authority or limitations or short of statutory right;

"(4) Without observance of procedure required by law;

"(5) Unsupported by substantial evidence; or

"(6) Unwarranted by the facts."

11. The standards of review that we discuss in the text of this opinion as applying to the circuit court are the same standards for this Court. A court should review the record for errors of law; ensure the decision is supported by competent, material, and substantial evidence in the whole record; and ensure the findings and ultimate decision of a family law master are not clearly erroneous or an abuse of discretion. In reviewing the decisions of the circuit court, the scope of this Court's review is relatively narrow. Our role is limited to considering errors of law and making certain that the circuit court adhered to its statutory standard of review of factual determinations, that is, whether the family law master's findings are supported by substantial evidence and consistent with the law.

Where there is disagreement between the circuit court and the family law master, however, the substantial nature of the evidence supporting the circuit court's findings is further called into question, and this Court must examine the record with greater care. This is so even when that circuit court does not disagree with the family law master's factual findings, as such, but draws different inferences from the facts.

■ We also stated in *Sullivan,* 187 W.Va. at 455, 419 S.E.2d at 716,[12] "that one of the chief purposes of the legislative adoption of the family law master system was to *expedite* divorce, alimony, and child support procedures. *See* W.Va.Code, 48A–4–11 (1990)." (Emphasis added). Thus, when the statutory mandates are coupled with the purposes of our family law master system, it hardly can be argued that the Legislature intended for the circuit courts of this State to have *de novo* reviewing authority.[13]

Our cases implicitly have recognized the limitations on the standard of review for circuit courts. In *Wharton v. Wharton,* 188 W.Va. 399, 403, 424 S.E.2d 744, 748 (1992), we used the following language in reversing an order of the circuit court: "We find the circuit court's order refusing to follow the family law master's recommendation to increase Mrs. Wharton's alimony to $1300 per month was not required by the 'ends of justice' and was against the preponderance of the evidence." Similarly, both the language and purpose of W.Va.Code, 48A–4–20(c), indicate the scope of review accorded to circuit courts is limited.[14]

■ When the Legislature enacts laws, it is presumed to be aware of all pertinent judgments rendered by the judicial branch. By borrowing "terms of art in which are accumulated the legal tradition and meaning of centuries of practice, [the Legislature] presumably knows and adopts the cluster of ideas attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed." *Evans v. United States,* 504 U.S. 255, 259, 112 S.Ct. 1881, 1885, 119 L.Ed.2d 57, 67 (1992). *See also Lorillard v. Pons,* 434 U.S. 575, 583, 98 S.Ct. 866, 871, 55 L.Ed.2d 40, 47 (1978) (" '[W]here words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country they are presumed to have been used in that sense unless the context compels to the contrary.' *Standard Oil v. United States,* 221 U.S. 1, 59, 31 S.Ct. 502, 515, 55 L.Ed. 619[, 646] (1911)"). When the Legislature enacted W.Va.Code, 48A–4–20(c), it intended the phrases "abuse of discretion" and "unsupported by substantial evidence" as used in this section to encompass the entire panoply of definitions which the judicial branch previously ascribed to those terms. The words used in W.Va.Code, 48A–4–20(c), are nearly identical to the language of the West Virginia Administrative Procedures Act, W.Va.Code, 29A–5–4(g) (1964). Specifically, subsection (g) of the Act uses such terms as "clearly wrong," "abuse of discretion," and "unwarranted exercise of discretion." Our cases have consistently held that judicial review under subsection (g) is deferential. *See Ran-*

---

**12.** Three reasons exist for giving deference to a family law master's findings: (1) a family law master is an expert at determining the facts in family law cases; (2) duplication of a family law master's efforts by a circuit court would be costly and would contribute only negligibly to the accuracy of the determination of facts; and (3) the parties already have focused their energies and resources on the family law master's determination. *See generally Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 574–75, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518, 529 (1985).

**13.** The scope and standard of review also are limited by W.Va.Code, 48A–4–18 (1993). Subsection (a) of this statute provides for the formal requirements of review and, after discussing the contents of the petition, the following language appears: "Only the questions set forth in the petition or fairly included therein will be considered by the court. Parts of the master's report not excepted to are admitted to be correct, not

only as regards the principles, but as to the evidence, upon which they are founded."

**14.** In *Higginbotham v. Higginbotham,* 189 W.Va. 519, 521–22, 432 S.E.2d 789, 791–92 (1993), this Court made explicit the standard of review under W.Va.Code, 48A–4–10(c) (now W.Va.Code, 48A–4–20), when we said:

"We recognize that under W.Va.Code, [48A–4–20(c) (1993)], a circuit court 'may, in its discretion, enter an order upon different terms, as the ends of justice may require.' *This section, however, limits a circuit judge's ability to overturn a family law master's findings and conclusions unless they fall within one of the six enumerated statutory criteria contained in this section.*" (Emphasis added; footnote omitted). We believe the position of Steven H. is foreclosed by *Higginbotham,* and we are given no reason to depart from that ruling.

*dolph County Bd. of Educ. v. Scalia*, 182 W.Va. 289, 387 S.E.2d 524 (1989); *West Va. Human Rights Comm'n v. United Transp. Union, Local No. 655*, 167 W.Va. 282, 280 S.E.2d 653 (1981).

■ The Legislature's use of such phrases as "abuse of discretion," "[u]nsupported by substantial evidence," and "[u]nwarranted by the facts" are phrases of limitation for appellate review purposes. W.Va.Code, 48A–4–20(c). As a practical matter, many of these phrases are not susceptible to categorical definition. However, circuit courts are well aware of such concepts as "clearly erroneous" and "abuse of discretion" and are in a position to determine which cases fall into these categories.[15]

In addition to giving general guidance as to how the division of responsibility is to be exercised, the Legislature enacted this statute for the very purpose of allocating the various decision-making responsibilities between the family law master and the circuit courts. When a statutory provision's purpose is to conserve judicial resources by preventing duplication of effort, it would be counterproductive to adopt an intensive standard of *de novo* appellate review.[16] Indeed, it would defeat the purpose of W.Va.Code, 48A–4–20(c), to permit review of findings of fact without deference to the family mas-

ter. For this reason, we make it explicit that a circuit court must review findings of fact made by a family law master under the clearly erroneous standard.

■ Under the clearly erroneous standard, if the findings of fact and the inferences drawn by a family law master are supported by substantial evidence, such findings and inferences may not be overturned even if a circuit court may be inclined to make different findings or draw contrary inferences.[17] *See also Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 577, 105 S.Ct. 1504, 1513, 84 L.Ed.2d 518, 530 (1985); *Beck v. QuikTrip Corp.*, 708 F.2d 532, 535–36 (10th Cir.1983) (findings of fact may be adequate even if they are not exhaustive when the record supports those findings of fact); *Maxwell v. Mason*, 668 F.2d 361, 362 (8th Cir.1981).

There are many critical aspects of an evidentiary hearing which cannot be reduced to writing and placed in a record, e.g., the demeanor of witnesses. These factors may affect the mind of a trier of fact in forming an opinion as to the weight of the evidence and the character and credibility of the witnesses. Thus, the importance of these factors should not be ignored by a reviewing court. Given a family law master's intimate familiarity with the proceedings, the family law master is in

---

**15.** The distinction between "clearly erroneous" and "abuse of discretion" often is obscure. Judge Friendly suggests that a discretionary ruling may not be set aside by an appellate court " 'unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors.' " The Honorable Henry J. Friendly, *Indiscretion about Discretion*, 31 Emory L.J. 747, 763 (1982). (Citation omitted). Obviously, this is the same articulation this Court has adopted for the clearly erroneous standard of review for factual findings and, in many of our cases, we have used them interchangeably. Perhaps the most important difference is that the "clearly erroneous" standard is constant, while the "abuse of discretion" standard as to the specific degree of deference accorded very well may depend on the nature of the ruling being reviewed.

**16.** Our decision to require deferential review of the family law master's findings of fact is consistent with Rule 52(a) of the West Virginia Rules of

Civil Procedure, which adopts the following widely accepted formula: "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Our cases indicate that Rule 52(a) is applicable to a circuit court's review of a family law master's findings. *See Higginbotham v. Higginbotham, supra; Whiting v. Whiting*, 183 W.Va. 451, 396 S.E.2d 413 (1990).

**17.** " 'A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Board of Educ. v. Wirt*, 192 W.Va. 568, 579 n. 14, 453 S.E.2d 402, 413 n. 14 (1994), *quoting United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 766 (1948).

the best position to weigh evidence and assess credibility in making the ultimate ruling on disputed issues.

As we said in *Board of Education v. Wirt,* 192 W.Va. 568, 579, 453 S.E.2d 402, 413 (1994): "Indeed, if the lower tribunal's conclusion is plausible when viewing the evidence in its entirety, the appellate court may not reverse even if it would have weighed the evidence differently if it had been the trier of fact." (Citation omitted).[18] This deference given to the lower tribunal in *Wirt* also is appropriate in the present case because the family law master "is in a position to see and hear the witnesses and is able to view the case from a perspective that an appellate court can never match." *Weil v. Seltzer,* 873 F.2d 1453, 1457 (D.C.Cir.1989). (Citation omitted).

We do not mean to suggest by today's holding that a circuit court is prohibited from conducting a meaningful review of a family law master's findings of fact and conclusions of law. To the contrary, the very statutory provision in question compels appropriate review by limiting the grounds upon which a family law master's decision may be affirmed by a circuit court. We merely hold that a circuit court may not "improperly conduct[ ] . . . a *de novo* weighing of the evidence in the record." *Anderson,* 470 U.S. at 576, 105 S.Ct. at 1513, 84 L.Ed.2d at 530 (reversing the lower court because of that error). Similarly, although this deferential standard applies to all findings of fact, including those described as "ultimate facts" or "factual conclusions," this standard "does not inhibit [a circuit] court's power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law." *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 501, 104 S.Ct. 1949, 1959–60, 80 L.Ed.2d 502, 517 (1984). (Citations omitted).

■■■ In addition, the foregoing discussion should not be interpreted as stripping a circuit court of its primary function as an expositor of the law. Questions of law are reviewed *de novo.* *Committee on Legal Ethics v. McCorkle,* 192 W.Va. 286, 452 S.E.2d 377 (1994). The identifying features of questions of law are: (1) they are general; (2) they do not normally rest on the existence or nonexistence of specific facts; and (3) they result in consistent governing legal rules. Questions of law should be standardized regardless of the facts. Therefore, we review alleged errors with regard to applying the law to findings of fact under an abuse of discretion standard.[19]

■■■ In summary, we hold if a circuit court believes a family law master failed to make findings of fact essential to the proper resolution of a legal question, it should remand the case to the family law master to make those findings.[20] If it is of the view

---

**18.** *See also Bloss & Dillard, Inc. v. West Va. Human Rights Comm'n,* 183 W.Va. 702, 705, 398 S.E.2d 528, 531 (1990); *Frank's Shoe Store v. W.Va. Human Rights Comm'n,* 179 W.Va. 53, 56, 365 S.E.2d 251, 254 (1986).

**19.** We caution circuit courts to limit *de novo* review to questions of law. W.Va.Code, 48A–4–20(c), as interpreted by this Court, requires that *no* finding of fact may be set aside unless it is clearly erroneous. We do not make exceptions or purport to exclude certain categories of findings nor do we divide findings of fact into those that deal with "ultimate" and those that deal with "subsidiary" facts. *Pullman–Standard v. Swint,* 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66, 78–79 (1982). Our reference to mixed questions of law and fact is limited to "questions in which the historical facts are admitted or established, the rule of law is undisput-

ed, and the issue is whether the facts satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated." 456 U.S. at 289 n. 19, 102 S.Ct. at 1790 n. 19, 72 L.Ed.2d at 80 n. 19.

If a family law master's fact-finding function is at issue, the standard of review is the clearly erroneous standard. If the challenge is to a family law master's application of the law to the facts, the abuse of discretion standard is appropriate. If the ruling more closely resembles a question of law, it may be reviewed *de novo.*

**20.** Under W.Va.Code, 48A–4–20(d), the circuit court has another option. Where necessary to develop an adequate record, the circuit court may hear additional evidence and make its own factual findings. In this capacity, the circuit

that the findings of fact of a family law master were "clearly erroneous," the circuit court may set those findings aside on that basis. If it believes the findings of fact of the family law master are unassailable, but the proper rule of law was misapplied to those findings, the circuit court may reverse. However, a circuit court may not substitute its own findings of fact for those of a family law master merely because it disagrees with those findings. *See Icicle Seafoods, Inc. v. Worthington,* 475 U.S. 709, 106 S.Ct. 1527, 89 L.Ed.2d 739 (1986). Thus, it is by these aforementioned standards that a circuit court must review the findings of fact and the application of law of a family law master.

■ Any reasonable review of the record demonstrates that the circuit court afforded no deference to the findings of the family law master and instead improperly substituted its own judgment.[21] The circuit court found Dr. Gardner's testimony to be credible and adopted his analysis of the facts. While it is clear that the circuit court disagreed with the findings of the family law master, the court failed to demonstrate how those findings could be characterized as clearly erroneous. At no time did the circuit court make a determination whether there was substantial evidence supporting the factual findings of the law master or whether the inferences reached were plausible under the facts. To the contrary, the circuit court conducted a *de novo* review of the evidence and made his own credibility determinations.

■ The family law master not only relied upon three expert witnesses, Dr. Preville, Ms. Workman, and Ms. Rockwell, but also upon the testimony of Sherry H. and

Barbara B. Even if we concede that Ms. Rockwell's interview techniques contaminated the credibility of Ashley's subsequent statements, the family law master could still consider the fact that Ashley complained to her mother and to her mother's sister that her father sexually abused her. These complaints began a year before she was subjected to the interview by Ms. Rockwell. Sherry H. was not quick to respond to these charges and did not file the petition for visitation modification until after she received Ms. Workman's opinion. It is also clear that these allegations of abuse were not raised during the heat of a custody battle. In fact, substantial evidence supports the finding that Sherry H. was more than accommodating to Stephen H.'s visitation rights.

It should also be noted that Ashley met with Ms. Workman in July and August of 1990. She met with Ms. Rockwell in October and November of 1990. Therefore, it is plausible to infer that Ms. Workman's initial findings were not tainted by the improper interview techniques of Ms. Rockwell.

## VII.

## CONCLUSION

Based on the foregoing, we find the findings of the family law master are supported by substantial evidence in the record and the circuit court erred in overturning each and every finding of fact of the family law master when such findings are substantially supported by record evidence.[22] Accordingly, we reverse the decision of the circuit court and remand this case with instructions to reinstate the findings of fact of the family law master and her recommended decision.

Reversed and Remanded.

court becomes, for this limited purpose, the "trier of fact" and the deferential review discussed earlier does not apply. It is contemplated that this option would be the exception and not the rule. Otherwise, the circuit court would usurp the very function committed to the family law master by the Legislature.

21. This case is unique in that portions of the hearings before the family law master were videotaped and reviewed by the circuit court and this Court. However, the entire proceedings

were not available on videotape. Therefore, because the family law master was present during every phase of the proceedings, she was in the better position to assess credibility and weigh the evidence.

22. Because we agree with the plaintiff that the circuit court committed reversible error on this issue, we decline to address the plaintiff's remaining assignments of error.

BROTHERTON, J., did not participate.

FOX, J., sitting by temporary assignment.

NEELY, C.J., dissents and files a dissenting opinion.

WORKMAN, J., concurs and files a concurring opinion.

[Filed March 8, 1995]

NEELY, Chief Justice, dissenting:

One of the preeminent tools of judicial craftsmanship is the plausible rewriting of national and state history. As Thomas Jefferson was fond of pointing out, the world belongs to the living; thus, when there are unpleasant traditions associated with the otherwise revered dead, it is more tactful judicially simply to revise history than to confront it. The difference, then, between an historian and a judge is that the historian achieves prominence by accurately illuminating the past; a judge achieves prominence by revising the past to please the living.

The majority opinion is firmly in this judicial revising tradition, but I'm not dead yet and I *know* what was intended in the judicial review procedure set out in *W.Va.Code* 48A–4–10 [1990]. After all, I was on the supreme court when the family law master system was brought into existence. So here beginneth the true history:

It came to pass in those days that the federal government was mightily annoyed that deadbeat fathers were not paying child support and thus forcing that obligation of support onto the federal government. So the federal government mandated, as part of the conditions for receiving federal dollars for public assistance [aka "welfare"], that the states develop an expeditious and effective system for enforcing child support.

After much debate and compromise, the family law master system was devised [1], and it simply institutionalized the system that had existed in this State since the memory of man runneth not to the contrary of the "divorce commissioner." The divorce commissioner was (and is) a master in chancellery whose only job was (and is) to make a record for the circuit judge in a contested divorce case, find facts, and forward a recommended ruling. NEVER, EVER, ANYWHERE IN THE LAW was it thought that any formal standard of review applied to a master's report. The judge could do whatsoever he wanted after exceptions to the report were filed subject, of course, to appeal to this Court, where the original master's report was (and is) part of the record and WE could (and can) choose to adopt the master's report when in OUR review we find the master's decision better than the judge's.

Our statute, *W.Va.Code,* 48A–4–10 [1990] simply codifies that procedure and the standard of review under it. Well ... one might ask, why shouldn't the majority rewrite history, correct the legislature's lack of wisdom and foresight, and establish a more academically sound procedure modeled on other hierarchical systems? [2] The answer, of course, is that there is nothing "academic" about real world law, and most discussion of standards of review in the reported cases emerge from law clerk watch winding; judicial staffs simply mouth platitudes because they really don't give a healthy damn about the underlying case or the justice thereof.

1. Much of this debate centered in who would get the jobs. The militant feminists who for both ideological and personal reasons were the moving force behind the bill that passed, wanted a *quasi*-judicial system because they understood that they would never be able to win elections in a *real* judicial system under *W.Va. Const.* Art. VIII. Governor Arch A. Moore, Jr. wanted an administrative system like workers' compensation that he could control. The compromise was a quasi-judicial system in which the governor appointed the law masters and welfare [department of health and human services] administered the whole program. Once the bill passed, however, the governor forgot he ever met the feminists and appointed his own conservative Republican political friends who were mostly white males—thus providing one of the few recent examples of poetic justice.

2. God knows, I'm not above doing exactly that from time to time in a proper case, so I'm not talking about principle but rather about wisdom. Judicial activism is one thing; stupid judicial activism quite another.

For example, when I review a circuit court decision, notwithstanding what my young law clerks write about standards of review in my reported opinions, my first real question is: "Is the circuit judge a twit?" If the answer to that question is a resounding "yes," then I haul out the "close scrutiny" standard of review that the old, pro-civil liberties, caring U.S. Supreme Court sent me in the early 1970's when I became a judge and that I've kept ever since in the bottom drawer of my desk. Once I figure out what *ought* to happen, I put my clerks on autopilot to manipulate precedent to arrive at the correct result regardless of what standard of review has been consistently set forth (and just as consistently ignored whenever anyone gave a damn about the case) in a few stock paragraphs stored in everyone's word processor.

I believe, based on real rather than imagined history, that a circuit judge has unbridled discretion to "examine the recommended order of the master, along with the findings and conclusions of the master, and may . . . enter an order upon different terms, as the ends of justice may require. . . ." *Code*, 48A–4–10 [1990]. Remember: it is the circuit judge's order and not the master's that ultimately emerges from the lower court. The enumerated reasons for which a circuit judge *must* overturn a master's decision in *Code* 48A–4–10 [1990] are simply icing on the cake and are provided to give lawyers mechanical categories into which they may arrange *their* exceptions to the master's report. But the judge is not precluded from concluding that the law master is a twit. Thus, the judge doesn't need a specific assignment of error to change something: after all, it has always been the *judge's* final order.

Furthermore, all of this makes wonderful sense politically. Judges—i.e., *REAL* judges—are elected in this State (thank God!) and neither the legislature nor the people were disposed to change that selection criterion when the judiciary was entirely restructured by the 1974 judicial reorganization amendment. Family law masters are *not* judges, and it is important to remember that. Family law masters are neither (1) elected like judges nor (2) paid like judges. Although a circuit judge earns today only $80,-000 a year, in light of the pension benefits that accrue after 16 years of service, the effective rate of pay for a circuit judge is closer to $130,000 depending, of course, on the judge's age at the time of election, his proximity to the age of 65, and the likelihood that he will beat the standard mortality tables. But there is no lack of takers for a circuit judgeship and circuit judges are well respected, well regarded, and well trusted figures in their respective counties. Family law masters are just low paid bureaucrats!

This is not to say that law masters are not often very intelligent, very hard-working, and very concerned quasi-judicial officers. But they are *not* circuit judges! Family law masters have never been elected; family law masters are appointed by the governor and not the circuit judge; family law masters have only a four year term with no guarantee of "good behavior" retention; and, family law masters (as opposed to circuit judges) have no higher requirement for appointment than a law degree, membership in the bar, and friendship with a governor or county chairman.

Thus, it seems to me that to clothe a family law master with all of powers of a *W.Va. Const.* art. VIII, court is unconstitutional. If family law masters are simply state-paid masters in chancellery with certain broadened powers to make temporary orders and modify existing orders, then I can live with that scheme as long as at least *theoretically* the circuit judge is making the policy decisions. If, however, the system has become so complex that there must now be a court-like hierarchy where each level grants the one below it deference in everything (or at least pays lip service to granting deference) then I believe that we should declare the entire law master system unconstitutional again and repair to the legislature for an *elected*, limited-jurisdiction domestic relations court that will be adequately paid, placed under the judicial retirement system, and given such a suitably long term that good behavior will ensure a high likelihood of re-

election. *See Starcher v. Crabtree*, 176 W.Va. 707, 348 S.E.2d 293 (1986).

I would, therefore, affirm the circuit judge as I see no plainly erroneous decision on his part.

[Filed July 24, 1995]

WORKMAN, Justice, concurring:

While the majority reaches the absolutely correct result, I vehemently disagree with the new law they created in so doing. The majority opinion has no groundings in the history and development of the Family Law Master (hereinafter referred to as "FLM") system and reflects very little understanding of its current status. It in essence treats the most important human issues facing the courts as if they are of no more consequence than administrative matters.

The decision is wrong from a legal standpoint and even more wrong from a policy perspective. It deprives the circuit courts of original jurisdiction, effectively reversing an opinion of this court without ever considering or even citing it, and ventures dangerously close to clothing a statutorily-created system with the status of a constitutionally-created court.

## I.

### *Legislative History of the Family Law Master System*

First, an examination of the history of the FLM system is necessary as a backdrop to this discussion. With the passage of the Child Support Enforcement Amendments of 1984, P.L. 98–378, Congress imposed a requirement on states to establish expedited judicial or administrative processes for obtaining and enforcing support orders.

In 1986,[1] the West Virginia Legislature debated the numerous issues concerning the current domestic relations law and how the state should respond to the new federal mandate for an expedited process. The Legislature enacted a quasi-judicial[2] system that granted family law masters broad authority in the area of domestic law—jurisdiction which far exceeded issues solely related to child support. The subject matter jurisdiction granted to the family law masters in West Virginia resulting from the federal mandate was significantly broader in scope than that granted to quasi-judicial officers in many other states who are limited to matters defined by the federal mandates.

Over the ensuing years, it became obvious that the FLM system was underfunded, unmanaged, and ineffective, both in the quantity and quality of its performance. Beginning in 1989, this Court each year began imploring the Legislature to bring reform to this system. In 1993, we went so far as to formally request that the Legislature either reform the system or else remove it from affiliation with the judicial branch.[3]

The legislature failed to enact all the recommended reforms, but did move the FLM

---

1. Prior to the enactment of legislation creating the FLM system, all domestic relations matters were entirely under the purview of the circuit courts, although it was a commonplace practice in West Virginia for courts to appoint Divorce Commissioners to hear divorce cases and make recommendations concerning issues of support, custody, and distribution of marital assets. The circuit courts, however, retained full original jurisdiction of domestic relations cases.

2. There was initially great debate over whether the system should be strictly administrative or quasi-judicial. The result of that first legislation was a quasi-judicial system peopled by lawyers appointed by the governor to serve only part-time. Although called "judicial officers," family law masters were under the budget of the Department of Human Services and the Court Ad-

ministrator of the West Virginia Courts had no administrative authority over this system.

3. Speaking for the Court in my State of the Judiciary address in 1993, I said:

I turn now to the most pressing need of the judicial system and the area in which we most earnestly seek your help—the Family Law Master System.

Without legislative action, the Family Law Master System is scheduled to sunset on July 1st of this year. We are asking that this program be continued, but with substantial changes. If it is not continued, we stand to lose approximately one million dollars in federal funds.

In 1991, you commissioned a performance audit of the Family Law Master System as part of the sunset review procedure. The audit

system to the judicial budget, modify it to a split full-time/part-time system, and give the Court some measure of authority in drawing the geographic regions.

Although the Administrative Office of this Court has sought to bring management and coordination to the FLM system, it cannot in its present form be regarded as a family court system [4] entitled to the level of deference the majority suggests. Many family

> recommended that the system be continued, but that several changes be made to improve the delivery of services. The most significant of these recommendations included:
>
> moving the budget for the program from the department to the court system;
>
> making the Masters full-time, thus prohibiting them from engaging in a private practice of law, and compensating them commensurately;
>
> realigning the Family Law Master regions to create larger regions with multiple Masters and more equitably distribute the caseload;
>
> and allowing the Supreme Court to appoint the Masters.
>
> We agree that the budget should be moved to the Supreme Court. The system is critically underfunded and the projected deficit for the present year is $128,000. Masters have grossly inadequate facilities, and do not have even the most basic office supplies.
>
> We believe that in order for this system to work, it must be given some very basic tools. In the Governor's state of the state address, he spoke of a state employee forced to add rows and rows of figures without even a hand calculator. Our Family Law Masters are being asked to take families in the crisis of both financial and emotional disruption and to fairly divide their assets—sometimes everything they've accumulated over a lifetime—as well as sort out child custody, visitation and support—without calculators, without phones people can get through on, without postage to mail out notices, sometimes without even a place to hold hearings.
>
> We have no desire to create a lush bureaucracy. As I said earlier, the U.S. Department of Justice has identified West Virginia as the most cost-efficient judicial system in the nation. But the Family Law Master System simply cannot function effectively for the people of West Virginia if it continues to be treated like an unwanted stepchild.
>
> We also agree with your audit that the Family Law Masters should not maintain outside law practices and should be compensated accordingly.
>
> As a result of changes in both Federal and State law, domestic cases are far more complicated now than they were in 1986 when the System was created, and the caseloads are increasing rapidly. As the full work increases, the job demands the full-time attention of the Masters.

law masters still remain part-time only, most continuing to conduct private law practices as well as perform their judicial duties.

## II.

### *Starcher v. Crabtree*

In 1986, the constitutionality of the newly enacted statute was challenged in *Starcher v.*

> . . . .
>
> We agree that the current regions need minor realignment, and the system needs three additional Masters to work in our busiest areas.
>
> We do not agree with the audit recommendation that the Court appoint the Masters, but do urge that we be given some authority over their tenure. We propose that the Court have the authority to certify a vacancy to the Governor if a Family Law Master does not carry out his or her judicial responsibilities efficiently. Without that authority, we have no way to see to it that the job gets done.
>
> With the exception of transferring the budget to the Court, we recommend that these changes not take place until July 1, 1994, when the Masters' current term expires, and when the crisis is expected to peak.
>
> Without these changes, the System will continue to fail families in trouble. In some of our busiest regions, litigants have to wait months to get into court to obtain temporary orders for immediate necessities like child support, medical care, and housing. In the meantime, they may be evicted from their homes; children may go without food, clothing, and medical treatment; non-custodial parents may be denied visitation; and children may live in limbo as to their most important relationships.
>
> The emotional and financial chaos of divorce is a traumatic event for families even under the best of circumstances. To subject these families to intolerable delays in the court system only compounds their crisis. We need your help.
>
> *If you do not see fit to make these changes— changes which are consistent with what we have recommended for the past four years—then we urge you to place the Family Law Master System in another agency of state government.* We in no way seek to shirk our responsibility in this area, but under current circumstances and resources, we simply cannot manage this program with the same efficiency we operate the rest of our system.

4. Neither this statement nor anything in this opinion is intended to denigrate the quality of the current family law masters.

*Crabtree,* 176 W.Va. 707, 348 S.E.2d 293 (1986), wherein the petitioner claimed the legislation divested the circuit courts of original jurisdiction. This court agreed and found the statute unconditional. Specifically, our reasoning was based on the conclusion that the circuit courts would retain "only a limited appellate jurisdiction" under the statute. *Id.* at 708, 348 S.E.2d at 294 [5] and deprived the circuit courts of original jurisdiction. The *Starcher* case necessitated a special session of the state legislature, held at considerable expense to the taxpayers,[6] to correct the constitutional deficiencies of the FLM system.

In *Starcher,* this Court set forth a brief history of the law relating to jurisdiction of divorce cases:

Before West Virginia was a state, the power to grant divorces resided in the Virginia legislature by special enactment. The legislature, however, lost its power to grant divorces when the West Virginia Constitution was ratified. Article 6, Section 39 prohibits the legislature from granting divorces, but states that "the legislature shall provide, by general laws, for (divorces)." Thus, while the legislature lost the power to grant divorces, it still retained many powers, including the power to choose the forum for divorce. Under the 1872 West Virginia constitution, the legislature could either allow the circuit courts to handle divorces under Article 8, § 12 or form a limited court for that purpose under Article 8, § 19. The legisla-

ture allowed both to have concurrent jurisdiction. *See* W.Va.Code § 48–2–5 (1980). The courts, recognizing the legislature's ability to change forums, acknowledged that neither law courts nor equity courts had the inherent power to dissolve marriages and the authority of a court to decree a divorce was purely statutory. *See* e.g., syl. pt. 1, *State ex rel. Cecil v. Knapp,* 143 W.Va. 896, 105 S.E.2d 569 (1958).

Courts of limited jurisdiction, however, were abolished by the Judicial Reorganization Amendment of 1974 to the West Virginia Constitution. *See* W.Va. Const. Art. 8, § 5. *The amendment eliminated the legislature's power to change the jurisdiction of divorce cases and constitutionally placed divorce cases in the circuit court. See Patterson v. Patterson,* 167 W.Va. 1, 277 S.E.2d 709, 715 (1981).

176 W.Va. at 708–09, 348 S.E.2d at 294–95 (emphasis added).

Thus, we concluded that "[b]ecause the constitution places the jurisdiction for divorce and other domestic matters in the circuit court, the legislature's efforts to divest this jurisdiction by statute is [sic] unconstitutional and therefore void." *Id.* at 709, 348 S.E.2d at 295 (footnote omitted).

Even the two dissenters in *Starcher,* Chief Justice Miller and Justice McGraw, in urging that the constitutionality of the statute be upheld, were specific in pointing out that the Court needed to clarify that review by the

---

5. House Bill 2094 at § 48A–4–9 provided, in part, that a circuit court would review a family law master's final order when a petition for review had been properly filed. Once such review was undertaken, the statute provided that the circuit court could either enter an order affirming the master's final order or remand the case upon a finding that the master's final order was:

(1) Arbitrary, capricious, an abuse of discretion, or otherwise not in conformance with the law;

(2) Contrary to constitutional right, power, privilege, or immunity;

(3) In excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(4) Without observance of procedure required by law; [or]

(5) Unsupported by substantial evidence[.]

However, under no circumstances could the circuit court enter its own order contrary to the findings of the family law master. Thus, the circuit court had no power of review unless a petition for review was filed, and even the limited review which was provided did not include circuit court authority to enter a final order differing from the master's final order, but merely permitted remand.

6. There were other matters taken up in the special session, but this was one of the most significant.

circuit court should be *de novo. Id.* at 709 and 713, 348 S.E.2d at 295 and 299 (McGraw, J., dissenting and Miller, C.J., dissenting).

With the advent of the new statute, West Virginia Code § 48A–4–20 (Supp.1994), which was passed by the special session as a result of the *Starcher* case, a circuit court could review the recommended order of a family law master and retain authority to enter an order *differing from the recommendation of the family law master* if one of the six enumerated requirements is met.[7] In this manner, the divestment of original jurisdiction of the circuit court was corrected.

It is now the height of irony that just as the *original jurisdiction of the circuit courts* was abrogated in the legislation held unconstitutional by this Court in *Starcher,* the majority's interpretation of the current statute also infringes upon the original jurisdiction of the circuit courts. As aptly explained in *State v. Johnson,* 100 Utah 316, 114 P.2d 1034 (1941):

> "[o]riginal jurisdiction ... is the right to hear the cause, to make its own determination of the issues from the evidence as submitted directly by the witnesses; or of the law as presented, uninfluenced or unconcerned or limited by any prior determination, or the action of any other court

juridically determining the same controversy. Original jurisdiction as here used means the right of the court to make its own record, its own finding and determination. An original determination is one not founded upon one previously made. It is original in the sense that it stands alone upon its own base, not the outgrowth of some other."

*Id.,* 114 P.2d at 1037.[8]

Accepting the proposition that original jurisdiction implies the authority to make the court's own findings of fact, the narrowing of the standard of review accomplished by the majority severely infringes upon the circuit courts' original jurisdiction. "Original jurisdiction is the power to entertain cases in the first instance, as distinguished from appellate jurisdiction." *New Times, Inc. v. Arizona Bd. of Regents,* 20 Ariz.App. 422, 513 P.2d 960, 964 (1973), vacated on other grounds, 110 Ariz. 367, 519 P.2d 169 (1974).

The majority's reconstruction of legislative pronouncement restricts the circuit court scope of review, thereby elevating the jurisdiction and authority of the family law master. Such redistribution of judicial function ventures dangerously close, as Justice Neely[9] points out in his dissent to this opinion, to the unconstitutional creation of a new level of

---

**7.** West Virginia Code § 48A–4–20(c) provides:

The circuit court shall examine the recommended order of the master, along with the findings and conclusions of the master, and may enter the recommended order, may recommit the case, with instructions, for further hearing before the master or may, in its discretion, enter an order upon different terms, as the ends of justice may require. The circuit court shall not follow the recommendation, findings and conclusions of a master found to be:

(1) Arbitrary, capricious, an abuse of discretion or otherwise not in conformance with the law;

(2) Contrary to constitutional right, power, privilege or immunity;

(3) In excess of statutory jurisdiction, authority or limitations or short of statutory right;

(4) Without observance of procedure required by law;

(5) Unsupported by substantial evidence; or

(6) Unwarranted by the facts.

**8.** *See also In re American Waste & Pollution Control Co.* 588 So.2d 367 (La.1991) (Dennis, J., concurring) ("Original jurisdiction is the '[j]urisdiction to consider a case in the first instance. Jurisdiction of [a] court to take cognizance of a cause at its inception, try it, and pass judgment upon the law and facts....' " (quoting *Black's Law Dictionary* (6th ed. 1990)); Michael A. Ritscher et al., *The Status of Dual Path Litigation in the ITC and the Courts: Issues of Jurisdiction, Res Judicata and Appellate Review,* 18 AIPLA Q.J. 155, 161 (1990) ("Original jurisdiction is defined as 'Jurisdiction to take cognizance of a cause at its inception, try it and pass judgment upon the law and facts.' " (quoting *Black's Law Dictionary* (5th ed. 1979)).

**9.** While much of the other dissent from Justice Neely is couched in rhetoric with which I would disassociate myself, many of his underlying conclusions are absolutely accurate.

judicial authority. Article VIII, Section 1 of the West Virginia Constitution provides, in pertinent part, as follows: "The judicial power of the State shall be vested solely in a supreme court of appeals and in the circuit courts ... and magistrate courts ... and in the justices, judges, and magistrates of such courts."

Clearly, it was never the intent of the system that the family law masters enjoy original jurisdiction, but instead they were to make recommendations to circuit courts. It is obvious from *Starcher* that that is how this Court viewed the function of the masters, and further obvious from the special session of the legislature necessitated by that decision that this is what the legislature intended in its enactments in response to that opinion.

## III.

### An Uninvited Judicial Excursion

Equally troubling is the majority's insistence on rewriting a perfectly legitimate, clear, and unambiguous statute. Basic tenets of judicial restraint instruct us to refrain from interpreting that which is unambiguous. As we stated in syllabus point one of *Sowa v. Huffman*, 191 W.Va. 105, 443 S.E.2d 262 (1994), " '[a] statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect.' Syl. pt. 2, *State v. Epperly*, 135 W.Va. 877, 65 S.E.2d 488 (1951)." We also emphasized in *Sowa* that "[i]t is not the province of the courts to make or supervise legislation, and a statute may not, under the guise of interpretation, be modified, revised, amended, distorted, remodeled, or rewritten, or given a construction of which its words are not susceptible, or which is repugnant to its terms which may not be disregarded." 191 W.Va. at 111, 443 S.E.2d at 268 (citing *State v. General Daniel Morgan Post No. 548, Veterans of Foreign Wars*, 144 W.Va. 137, 145, 107 S.E.2d 353, 358 (1959)).

Unambiguous statutes simply do not call for our interpretation. For the majority to

have intervened to essentially redraft the legislative pronouncement is improper. We have employed the procedures set forth in the statute for circuit court review quite effectively, as illustrated by our decision in *Higginbotham v. Higginbotham*, 189 W.Va. 519, 432 S.E.2d 789 (1993). Furthermore, we indicated in *Whiting v. Whiting*, 183 W.Va. 451, 396 S.E.2d 413 (1990), and again in *Higginbotham*, that a circuit court which changes a family law master's recommendation must make known *its factual findings* and conclusions of law. *See Whiting*, 183 W.Va. at 456, 396 S.E.2d at 418, and *Higginbotham*, 189 W.Va. at 522, 432 S.E.2d at 792. With no indication of difficulty in application or interpretation, the majority steps in, uninvited,[10] and reformulates the standard of review. Judicial interpretation can be justified under *Sowa* where the statute is not clear, is ambiguous, or fails to express legislative intent. 191 W.Va. at 106, 443 S.E.2d at 263, Syl. Pt. 1. The statute in question does not fall into any of those categories.

Without justifying its intrusion into the legislative realm, the majority voraciously cites authority for the proposition that by borrowing terms of art from the legal tradition, the legislature is presumed to know the cluster of ideas attached to each word. What the majority appears painfully unaware of, however, is the fact that prior to seizing upon a method of interpretation, a court must reckon with the issue of whether the interpretation is justified. Thus, without justification for intrusion as a prerequisite, the manner of interpretation is irrelevant. Indeed, when judicial construction is necessary, such concepts as presumption of legislative knowledge of meaning or connotation of certain words would be appropriate. But where judicial construction or interpretation is uncalled for, as in the present case, launching into such discussion is meaningless and superfluous. The majority's decision in this matter is an example of highly imprudent judicial reconstruction of legislative action.

Furthermore, if the legislature had wanted to impose a "clearly erroneous" standard in

---

**10.** No one even raised this issue of the need for reformation or interpretation on appeal!

the FLM statute, it certainly could have done so. It has demonstrated its ability to employ those terms intelligently in the statutes on many other occasions,[11] and if such had been its intention in the family law master statute, it most certainly did not need the assistance of this Court to incorporate that concept of review.

## IV.

### *The Policy*

We have made great strides in bringing gender fairness to domestic law in West Virginia, to assuring that children are supported and that families in the strife of dissolution are treated with fairness and compassion. The fact that there has existed the right of broad review by constitutionally-created courts has helped assure that women and children are not relegated to the type of arbitrary, capricious, and unfair treatment in the judicial system that for many years was the norm.

Family law is not susceptible to a "how many angels can dance on the head of a pin" analysis. Although judges all too frequently view the difficult human issues that arise in family law as more in the nature of social work, not real "he-man" legal work, perhaps the fact that it has such an intrinsic overlay of psychological and sociological considerations makes it one of the most difficult areas of the law. Because it relates in such basic ways to personal safety (domestic violence) and basic human existence (child custody and support, and the division of assets of marriage partnerships) issues, it is also the most important.[12]

The writer of the majority opinion was not in the judiciary during the creation and evolution of the FLM system and did not practice domestic law, so the lack of history and insight into the system and the reality of how this area of the law works is understandable. I can only conclude his brethren were just asleep at the wheel.

---

**11.** The majority vainly attempts to justify its construction of § 48A–4–20 by attempting to synthesize the statute into its own characterization of the standard of review intended. Most importantly, the words "clearly erroneous" appear nowhere in the statute. If it was the intention of the legislature for that to be the standard, even a cursory reading of the West Virginia Code readily illustrates that the legislature, when it so desires, knows exactly how to impose a clearly erroneous standard of review. *See, e.g.,* W.Va. Code § 11–15A–13(c)(4) (1991) ("In any administrative or court proceeding brought to challenge the average whole price of gasoline and special fuel as determined by the tax commissioner, his determination shall be presumed to be correct and shall not be set aside unless it is *clearly erroneous.*") (emphasis added); W.Va.Code § 46A–7–106(3) (1995) (stating, in part, that "[a]fter hearing, the court may (a) reverse or

modify the order if the findings of fact of the attorney general are *clearly erroneous* in view of the reliable, probative and substantial evidence on the whole record...") (emphasis added). In "construing" § 48A–4–20, the majority has usurped legislative authority and effectively amended the statute.

**12.** It has been my observation during almost fourteen years on the bench that there is almost a macho-like quality in the kind of disregard the judicial system gives family law issues. There is a sense that it is just not nearly as important as high stake civil litigation or a significant criminal case. Yet to the individuals involved in these cases, these issues are, figuratively speaking, life and death.