489 S.E.2d 756

**Truman Dwayne BLANKENSHIP, Appellee,**

v.

**Sheryl Lynn Hiser BLANKENSHIP, Appellant.**

**No. 23817.**

Supreme Court of Appeals of West Virginia.

Submitted April 23, 1997.

Decided July 2, 1997.

Paul S. Detch, Lewisburg, for Appellee.

Mary Ellen Griffith, Bell & Griffith L.C., Princeton, for Appellant.

PER CURIAM: ·

This is an appeal by Sheryl Lynn Hiser Blankenship from an order of the Circuit Court of Greenbrier County awarding custody of her infant son to the appellant's former husband, Truman Dwayne Blankenship, in a divorce proceeding. On appeal the appellant, Sheryl Blankenship claims that the circuit court erred in finding that her former husband had been the primary caretaker of the child and in awarding him custody of their child. She also claims that the court erred in failing to take into account spousal violence in making the custody decision. After reviewing the issues raised and the documents filed, this Court believes that the appellant's claims are without merit. The judgment of the Circuit Court of Greenbrier County is, therefore, affirmed.

The parties to this proceeding, Sheryl and Truman Dwayne Blankenship, were married in November 1988. The infant child whose custody is an issue in this case, Shawn Blankenship, was born in November 1989.

On January 20, 1995, the appellee, Truman Dwayne Blankenship, instituted the present proceeding by filing a divorce complaint in the Circuit Court of Greenbrier County. In the complaint he alleged that the appellant, Sheryl Blankenship, due to mental depression, was unfit to have the care custody and control of their five-year-old son. Sheryl

Blankenship filed an answer and counter-claim in which she denied that she was unfit and in which she sought custody of the parties' son on the ground that she had been the primary caretaker of the child. A temporary hearing was held in the case on April 26, 1995, by a family law master. At that hearing Truman Blankenship adduced evidence from Sheryl Blankenship's father and step-mother indicating that he had been the primary caretaker of the child. Sheryl Blankenship presented evidence that she was a fit person and also elicited testimony from her mother that she had been the primary caretaker of the child. At the conclusion of the temporary hearing the family law master awarded Truman Dwayne Blankenship temporary custody of the child and ordered that home studies be conducted.

The divorce came on for a final hearing before the family law master on September 28, 1995. After that hearing the family law master issued a recommended decision on October 4, 1995. The family law master recommended that Truman Dwayne Blankenship be awarded the permanent custody of the child. The family law master stated:

> Testimony by the parties and the witnesses established that the Plaintiff performed the duties of the primary caretaker the majority of the time. Both of the parties displayed a sincere love and affection for the child and both are fit and proper persons to be awarded the custody of the child. Psychological problems experienced by the parties in the past have been resolved and do not pose a threat to the child. The Plaintiff is the primary caretaker and entitled to custody of the child.

Sheryl Blankenship challenged the family law master's recommendation, and the Circuit Court of Greenbrier County examined the issues presented. After conducting a hearing on December 22, 1995, the circuit court accepted the family law master's recommendation and ruled that Truman Dwayne Blankenship was entitled to custody of the child. It is from that ruling that Sheryl Blankenship is appealing in the present proceeding.

Sheryl Blankenship's first claim is that the trial court erred in finding that her former husband, Truman Blankenship had been the primary caretaker of the child.

■ The evidence adduced on the primary caretaker issue showed that when the child was born in November 1989, Truman Dwayne Blankenship was unemployed, but that in early 1990 he obtained work in Tennessee and returned home only on weekends. While he was working the parties' infant child remained with Sheryl Blankenship. Sometime thereafter Truman Dwayne Blankenship obtained construction work in West Virginia and although he returned to West Virginia he was out of the parties' home from approximately 5:00 a.m. until 5—6:00 p.m. each work day. Thereafter he was unemployed for a period of several months, but eventually found work at a McDonald's as a security guard. Truman Dwayne Blankenship started working full-time as a security guard in the summer of 1992 and worked from approximately 3:00 p.m. until 11:00 p.m. until the fall of 1994 when he changed to daytime hours. On the basis of this the appellant claims that the evidence demonstrates that for lengthy periods she was in actual charge of the child and that she was thus the primary caretaker and that Truman Blankenship was not, and could not have been, the primary caretaker since the child was not with him.

To counter Sheryl Blankenship's primary caretaker evidence, Truman Blankenship introduced evidence indicating that Sheryl Blankenship did not actually care for the child during much of the time the child was left with her. Rather, according to his evidence, Sheryl's mother took care of the child. Additionally, Truman Dwayne Blankenship, during the cross examination of Dr. Nancy Chambers, an associate professor of psychology at the West Virginia School of Osteopathic Medicine, adduced evidence suggesting that Sheryl Blankenship had a number of psychological problems which he suggested precluded Sheryl Blankenship from being the primary caretaker when she claimed to be the primary caretaker. Specifically, Dr. Chambers testified:

This client [Sheryl Blankenship] has endorsed a number of psychological problems suggesting that she is experiencing a high degree of stress. Although the MMPI–II clinical scale profile is probably valid, they may show some exaggeration of symptoms.

A severe psychological—according to this, a severe psychological disorder is reflected in this profile. She appears to be experiencing a florid psychotic process that includes personality decompensation, social withdrawal, disordered affect, and erratic, possibly assaultive behavior.

She appears to be quite confused, withdrawn, and preoccupied with occult or abstract ideas, and she may feel that others are against her because of her beliefs. She may appear quite apathetic; tends to spend a great deal of time in fantasy, and might suffer from hallucinations, blunted or inappropriate affect and hostile, irritable behavior. She appears confused and disoriented, and she may behave in unpredictable, highly aggressive ways.

This profile reflects chronic maladjustment, although she may presently be experiencing an intensification of problems.

It goes on in this vein: she endorsed a number of extreme and bizarre thoughts, suggesting the presence of delusions and/or hallucinations. She apparently believes she has special mystical powers or a special mission in life that others do not understand or accept. This hypersensitivity and fearfulness appear to be generalized at this point, and may be debilitating to her in social and work situations.

The relative—let's see, disturbed relationships are characteristic of individuals with this profile type. The client feels socially inadequate and has very poor social skills. She is rather introverted and is fearful and suspicious of others. She may be blatantly negative in social interactions.

She tends to need a great deal of reassurance. Martial [sic] break-up is not uncommon. Individuals with this profile are quite self-absorbed, and find marital relationships problematic. She is quite shy and inhibited in social situations, and she may avoid others for fear of being hurt. She is emotionally alienated from others.

Again, she has a high score on the marital distress scale.

It is most likely—the most likely diagnosis for individuals with this profile type is schizophrenia, possibly paranoid type, or a paranoid disorder. Her unusual thinking and bizarre ideas need to be taken into consideration in any diagnostic formulation.

Truman Dwayne Blankenship also introduced evidence that when the child was left in the care of Sheryl Blankenship she appeared to be absorbed in and preoccupied with her own activities. As a consequence, according to his testimony, when he was at home he had to perform many of the primary caretaker functions for the child. In support of Truman Dwayne Blankenship's position, Sheryl Blankenship's own stepmother testified:

Q Could you relate to the Court who, in your opinion, has been the primary caretaker?

A Truman Dwayne Blankenship.

Q Okay. Is there any question in your mind about that?

A No, sir, there is none.

Q Now then, could you relate to the Court how you arrived at your opinion that he was, in fact, the primary caretaker of the child?

A Well, when Shawn was born, Sheryl would not diaper him, she would not give him bottles. Dwayne had to get up in the middle of the night, feed him. The last few years, Dwayne had to teach him to be potty-trained. He knew when to break him off of the bottle.

Also, he would dress him. He would have to bathe him. He would have to come home from work at the sawmill as a security guard, he would have to fix meals for him.

He would have to take the clothes to the laundromat to wash for him. He would have to clean house. I've been down there and dishes piled up in the sink that far [indicating].

Q You're gesturing. Are you talking about a foot or two? Is that what you're referring to?

A Yes, uh-huh.

Q In any event, did Mrs. Blankenship, did she have the opportunity to do these things?

A Yes, she did. She would be sitting, playing with a parakeet. She'd be sitting, working word puzzles, playing Game Boys, watching television.

Q In your opinion, who do you think the best interest of the child would be, in terms of who should have the custody of this child, the father or the mother?

A The father.

Sheryl's stepmother further testified as follows:

Q Who actually provided and played with the child, nourished the child in terms of its emotional growth?

A Truman.

Q And that's the father?

A Uh-huh, (yes).

Q Who made arrangements for any social interaction with the child; that is, playmates or babysitting or doing anything of that nature?

A Truman. He would set up taking him to the park, taking him to the island park to play on the swings, taking him to the Alderson park, and we'd go picnics and things like that, but it was mainly Dwayne that done it all.

There was also evidence that after the parties separated Sheryl Blankenship was not diligent in attending to a severe case of athlete's foot which the parties' child developed while he was solely in her custody. After describing cuts on the child's head Sheryl Blankenship's stepmother testified:

... Also his feet, he had athlete's feet so bad that his feet was cracked open and they were bleeding.

Q And was that while the child was in the custody of the mother?

A Yes, it was.

\* \* \* \* \* \*

Q Well, what did you see, not—most of us know what athlete's foot is by the time we get through junior high school—

A Okay. His feet were cracked open, and I mean there was dirt ground in those cuts where—and then blood was seeping and was seeping up through these cuts in his feet.

Q And was this while this child was in the custody of the mother?

A Yes, it was.

There was also testimony to the medical care given to the child after Truman Dwayne Blankenship protested.

The fact that Truman Dwayne Blankenship had principally provided primary caretaking functions was corroborated by the testimony of other witnesses and contradicted by witnesses for Sheryl Blankenship.

■ In examining the question of the weight to be given to the findings of a family law master this Court stated in Syllabus Point 1 of *Stephen L.H. v. Sherry L.H.,* 195 W.Va. 384, 465 S.E.2d 841 (1995), that:

A circuit court should review findings of fact made by a family law master only under a clearly erroneous standard, and it should review the application of law to the facts under an abuse of discretion standard.

See also *Banker v. Banker,* 196 W.Va. 535, 474 S.E.2d 465 (1996).

The Court also stated in Syllabus Point 3 of *Stephen L.H. v. Sherry L.H., supra,* that:

Under the clearly erroneous standard, if the findings of fact and the inferences drawn by a family law master are supported by substantial evidence, such findings and inferences may not be overturned even if a circuit court may be inclined to make different findings or draw contrary inferences.

See also *Higginbotham v. Higginbotham,* 189 W.Va. 519, 432 S.E.2d 789 (1993).

In the present case, as previously indicated, Sheryl Blankenship contends that the circuit court erred in awarding custody of her infant son to the child's father who is the appellee in this proceeding.

■ In *Garska v. McCoy,* 167 W.Va. 59, 278 S.E.2d 357 (1981), this Court in Syllabus Point 2 stated:

With reference to the custody of very young children, the law presumes that it is in the best interests of such children to be placed in the custody of their primary caretaker, if he or she is fit.

In Syllabus Point 3 of the same case the Court stated:

The primary caretaker is that natural or adoptive parent who, until the initiation of divorce proceedings, has been primarily responsible for the caring and nurturing of the child.

In *Garska v. McCoy*, the Court indicated that in determining which parent has been the primary caretaker a trial court should focus upon who performs such functions as the preparing and planning of meals, bathing, grooming and dressing the child, putting the child to bed, disciplining and training the child, etc.

In examining the record in the present case, this Court believes that there was substantial evidence to suggest that Truman Dwayne Blankenship, the father of the child whose custody is in issue, did perform the key nurturing functions which *Garska v. McCoy* indicates identify a primary caretaker. For example, there was evidence that he prepared meals for the child, that he bathed the child, that he changed the child's diapers, and that he was substantially involved in training the child. There was also evidence suggesting that at the time in question Sheryl Blankenship had personality traits suggesting difficulty relating to others and self-absorption, and in fact testimony in the case suggested that while Truman Dwayne Blankenship was attending to the practical needs of the parties' child, Sheryl Blankenship played with a parakeet or worked wood puzzles.

Further, although it was argued that Truman Dwayne Blankenship was often away from home working and that Sheryl Blankenship was left with the child, and that Sheryl Blankenship must have been the primary caretaker at the time, there was evidence that Sheryl's mother frequently entered the parties' home at those times and that she rather than Sheryl Blankenship, provided for the child's needs.

Although the evidence indicating that Truman Dwayne Blankenship, as between the two parties, was the primary caretaker was contradicted, the evidence indicating that he was in fact the primary caretaker was very substantial.

As indicated in Syllabus Point 3 of *Stephen L.H. v. Sherry L.H., supra,* if the findings and inferences of the family law master are supported by substantial evidence they may not be overturned by the circuit court.

In this Court's view, the trial court correctly adopted the family law master's primary caretaker finding and recommendation relating to custody, given the nature of the evidence adduced. Although this evidence was somewhat contradicted by the appellant's evidence, the Court concludes that the evidence in favor of the father being a primary caretaker was substantial evidence and that under such circumstances the trial court did not clearly abuse its discretion in adopting the family law master's conclusion that the child's father was the primary caretaker or that custody of the child should be awarded to the child's father.

Another claim asserted by Sheryl Blankenship on appeal is that the family law master in the circuit court erred in failing to consider the effect of spousal violence in making the custody decision in this case.

■ In addressing this issue the Court notes that in the Syllabus of *Nichols v. Nichols,* 160 W.Va. 514, 236 S.E.2d 36 (1977), we recognized that:

Questions relating to alimony and to the maintenance and custody of the children are within the sound discretion of the court and its action with respect to such matters will not be disturbed on appeal unless it clearly appears that such discretion has been abused.

See also *Carter v. Carter,* 196 W.Va. 239, 470 S.E.2d 193 (1996); and Syllabus Point 2, *Michael v. Michael,* 196 W.Va. 155, 469 S.E.2d 14 (1996).

■ In the course of the proceedings in this case Sheryl Blankenship testified that during the marriage her husband had pushed her, had shoved her, and thrown things at her. She also testified that this had occurred

in the presence of their son and that he would hit her and say to the son: "Shawn, if you don't be a good boy, I'm going to whip your mom." None of this testimony was corroborated.

On January 3, 1995, Sheryl Blankenship left the marital home and went to her mother's. That night, according to her testimony, Truman Dwayne Blankenship went to her mother's home and began kicking in the door and threatening to kill her. This testimony was corroborated. Subsequently, Sheryl Blankenship obtained a temporary domestic violence protective order and took the parties' son to a women's refuge center in Lewisburg.

In spite of this testimony the family law master found that both parties were fit and proper persons to be awarded custody of the child, and, as previously indicated in the present proceeding, Sheryl Blankenship contends that this finding does not reflect the evidence of domestic violence and that the family law master and the circuit court erred in not making a finding insofar as Truman Blankenship was concerned in light of such evidence.

In examining the evidence in this case the Court notes that only the door incident was witnessed by any party other than Sheryl Blankenship herself. That event occurred on January 3, 1995, after Sheryl Blankenship left the marital home. The only other evidence of an act of violence was an admission by Truman Dwayne Blankenship that he had shoved Sheryl.

Although this Court believes that evidence of spousal abuse is appropriately a factor to be considered in determining what is in the best interest of an infant child in a custody situation, the Court cannot conclude that the very weak and limited spousal-abuse evidence presented in the present case, would justify the conclusion that the trial judge abused his discretion by adopting the family law master's custody recommendation. A court must consider and weigh many separate factors in making a custody determination. Certainly, Sheryl Blankenship's evidence of spousal abuse was before both the family law master and the court and was a factor considered by both. But it

was not the only factor. The evidence of Sheryl's psychological ability to relate in a marital relationship and to function as a parent was also developed, and that evidence was also properly considered by the master and the court. While the Court believes that allegations and evidence of spousal abuse are appropriate and necessary considerations in every child custody case, the Court cannot conclude that the evidence of spousal abuse in the present case is sufficient to justify a reversal of the trial court's custody decision.

For the reasons stated, this Court believes that the judgment of the Circuit Court of Greenbrier County should be affirmed.

The judgment of the Circuit Court of Greenbrier County is therefore affirmed.

Affirmed.