IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2021 Term

_____

No. 20-0558
_____

FILED
November 19, 2021
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

West Virginia State Police,
Respondent Below, Petitioner

v.

Derek R. Walker,
Petitioner Below, Respondent

_____

Appeal from the Circuit Court of Jefferson County
Honorable David M. Hammer, Judge
Civil Action No. 19-AA-3

Reversed and Remanded with Directions
_____

Submitted: September 29, 2021
Filed: November 19, 2021

Patrick Morrisey, Esq.
Attorney General
Anthony D. Eates II, Esq.
Deputy Attorney General
Charleston, West Virginia
Counsel for Petitioner

Gregory A. Bailey, Esq.
Arnold & Bailey, PLLC
Charles Town, West Virginia
Counsel for Respondent

JUSTICE HUTCHISON delivered the Opinion of the Court.
CHIEF JUSTICE JENKINS and JUSTICE ARMSTEAD concur, in part, dissent, in part, and reserve the right to file separate opinions.

**SYLLABUS OF THE COURT**

1. "On appeal of an administrative order from a circuit court, this Court is bound by the statutory standards contained in W. Va. Code § 29A-5-4(a) and reviews questions of law presented *de novo*; findings of fact by the administrative officer are accorded deference unless the reviewing court believes the findings to be clearly wrong." Syl. Pt. 1, *Muscatell v. Cline*, 196 W. Va. 588, 474 S.E.2d 518 (1996).

2. "The 'clearly wrong' and the 'arbitrary and capricious' standards of review are deferential ones which presume the agency's actions are valid as long as the decision is supported by substantial evidence or by a rational basis." Syl. Pt. 3, *In re Queen*, 196 W. Va. 442, 473 S.E.2d 483 (1996).

3. "Grievance rulings involve a combination of both deferential and plenary review. Since a reviewing court is obligated to give deference to factual findings rendered by an administrative law judge, a circuit court is not permitted to substitute its judgment for that of the hearing examiner with regard to factual determinations. Credibility determinations made by an administrative law judge are similarly entitled to deference. Plenary review is conducted as to the conclusions of law and application of law to the facts, which are reviewed de novo." Syl. Pt. 1, *Cahill v. Mercer Cnty Bd. of Educ.*, 208 W. Va. 177, 539 S.E.2d 437 (2000).

4. "A reviewing court must evaluate the record of an administrative agency's proceeding to determine whether there is evidence on the record as a whole to support the agency's decision. The evaluation is conducted pursuant to the administrative body's findings of fact, regardless of whether the court would have reached a different conclusion on the same set of facts." Syl. Pt. 1, *Walker v. W. Va. Ethics Comm'n*, 201 W. Va. 108, 492 S.E.2d 167 (1997).

5. "[A] reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the [lower tribunal's] account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, in part, *In Re Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

**HUTCHISON, Justice:**

The petitioner, the West Virginia State Police, appeals the "Order Reversing the Decision of the Hearing Examiner" entered by the Circuit Court of Jefferson County on July 24, 2020. In that order, the circuit court reversed the September 30, 2019, decision of a West Virginia State Police Grievance System hearing examiner and ordered the reinstatement of the respondent, Derek R. Walker, to his employment as a state trooper. After reviewing the parties' written and oral arguments, the appendix record on appeal, and the pertinent legal authorities, we conclude that the circuit court impermissibly substituted its judgment for that of the hearing examiner, who was the factfinder in this matter. Accordingly, we reverse the circuit court's order and remand this case to the circuit court for entry of an order reinstating the hearing examiner's order and the respondent's termination.

## I. Facts and Procedural History

On the early morning of November 19, 2018, Berkeley County Sheriff's Deputy Christopher Merson was driving his cruiser when he slowed to stop in the roadway. An approaching car rear-ended the cruiser and then sped away. Deputy Merson gave chase and was soon joined by four additional law enforcement officers from the Sheriff's Department and the State Police, including the respondent Trooper Walker. The driver of

the fleeing car, sixteen-year-old J.H.,[1] led the five officers on a dangerous, high-speed car chase that included weaving through traffic and nearly hitting another car in an intersection. Their speed reportedly exceeded one hundred miles per hour on a winding, two-lane road. The chase lasted less than two minutes, when J.H., traveling at a high rate of speed, violently crashed his car into a utility pole, snapped the pole, and caused an electrical explosion. J.H.'s car flipped and was badly damaged but came to rest on its wheels.

The five officers immediately arrived at the scene to arrest J.H. Deputy Merson's cruiser camera captured video of this arrest, including recording Deputy Merson approaching J.H.'s car and breaking the driver's window with his asp baton; the respondent and Deputy Merson pulling J.H. from his car and flinging him several feet through the air; four of the officers surrounding J.H., who was lying face-down on the ground, and administering a total of eight kicks and eleven punches to J.H. while J.H. was being handcuffed; the respondent attempting to lift J.H. from the ground by pulling only on the handcuffs fastened to J.H.'s wrists behind his back; and State Trooper Michael Kennedy flinging the handcuffed J.H. to the side of the road.[2]

---

[1] We refer to J.H. by his initials because he was a minor at the time of these events. *See*, *e.g.*, W. Va. R. App. P. 40(e); *State v. Edward Charles L.*, 183 W. Va. 641, 645 n.1, 398 S.E.2d 123, 127 n. 1 (1990).

[2] The cruiser camera recorded video but not audio.

Several days later, when State Police officials became aware of and viewed the cruiser camera video, State Police Superintendent Jan Cahill placed the respondent on unpaid administrative leave. After an internal investigation, the superintendent terminated the respondent's employment as a state trooper on January 17, 2019. The respondent filed separate grievances regarding his suspension and termination, which were consolidated for purposes of hearing and decision by a hearing examiner for the West Virginia State Police Grievance System.[3] The hearing examiner held an evidentiary hearing on July 22, 2019, viewed the video, and heard testimony from witnesses about the car chase, J.H.'s arrest, and the reasons for the respondent's termination. On September 30, 2019, the hearing examiner entered his decision upholding the respondent's suspension and termination.

At the evidentiary hearing, the respondent testified about how he and Deputy Merson approached J.H.'s car and Deputy Merson instructed J.H. to exit the vehicle.[4] Deputy Merson drew a firearm and used his baton to break out the driver's window. The hearing examiner found that the respondent did not draw a firearm but donned black gloves as he approached J.H.'s car. The hearing examiner found that the respondent then "forcefully and violently pulled [J.H.] through the car window. As a result of the force used by [the respondent] Walker, [J.H.] was propelled through the car window, into the air, and

---

[3] The grievance and this appeal only concern the respondent and his employment, not that of the other law enforcement officers who participated in these events.

[4] Deputy Merson did not testify at this administrative hearing.

landed approximately a body and a half length or more from the vehicle." The respondent testified that he and Deputy Merson had to remove J.H. from the car in this manner for the officers' safety inasmuch as visibility in the car was limited due to smoke and J.H. might have a weapon. The hearing examiner expressly found that the respondent's testimony about this "lacks the hallmarks of credibility." The hearing examiner found that the respondent's purported concerns "are belied by the fact that he stood next to the car; did not draw a weapon; and simply pulled [J.H.] from the vehicle when the window was removed. In light of the fact that [J.H.] had just experienced a horrific crash and Walker's action did not evidence concern for a potential attack from [J.H.], it is clear that the force used in this instance was excessive."

After being removed from his car, J.H., who was estimated to be approximately five feet, four inches tall and one hundred and twenty pounds, was lying prone on the ground. The respondent began placing handcuffs on J.H.'s wrists behind J.H.'s back, and then the respondent and the other officers delivered their blows to J.H. During his testimony, the respondent admitted that he personally kicked J.H. two times while J.H. was lying prone on the ground, but he asserted that the kicks were "compliance strikes" administered in response to resistance by J.H. to the application of the handcuffs. In his decision, the hearing examiner rejected the respondent's testimony. The hearing examiner found that "[a]lthough Walker testified that [J.H.] resisted by tensing up and pulling away from Walker's grip on his wrist area, this is not evident from the video." The hearing examiner explained that

4

[a]lthough [J.H.] squirmed momentarily on the ground, he was quickly surrounded by two Sheriffs' deputies and two State Troopers who easily overpowered him. The officers hit and kicked J.H. while forcing his head to the ground. . . .

The video demonstrates little to no resistance on the part of [J.H.]. Nonetheless, the officers involved continually punched and kicked [J.H.] while he lay face down on the ground. Although Kennedy was clearly the most aggressive in repeatedly striking [J.H.], Walker participated by kicking him twice. Walker used the term "compliance strike" to justify his actions. While this term may be a term of art in the law enforcement community, it is simply a euphemism in this case. Major White accurately described the activity on the video when he stated that the officers were "beating him up, quite frankly." To be clear, the facts and circumstances of the case do not support Walker's testimony as credible. Indeed, he offered no plausible explanation for kicking [J.H.] at [t]his moment.

The hearing examiner found that after the handcuffs were fastened on J.H.'s wrists behind his back, the respondent "jerked [J.H.] up by the handcuffs from the ground resulting in [J.H.] being momentarily dragged and turned over[.]" The hearing examiner concluded that "there was no evidence of resistance or potential flight" at this point in time, and "no demonstrable reason why" the respondent "chose to use this method" of pulling J.H. to his feet. The hearing examiner also found that Trooper "Kennedy then picked [J.H.] up in the same manner and slung [J.H.] to the side of the road." The respondent denied seeing Trooper Kennedy throw J.H. to the side of the road, but the hearing examiner found that the video depicted the respondent looking in Kennedy's direction.

5

While J.H. was being transported to the hospital, the respondent contacted the officer in charge, State Police Sergeant Michael Cole, to report that J.H. had fled and the officers had, to quote the respondent, "tuned him up." At the administrative hearing, the respondent testified that "tuned him up" is vernacular commonly used to indicate that officers had to lay hands on a perpetrator while making an arrest. The hearing examiner found that during this conversation with Sergeant Cole, the respondent failed "to report the manner in which he extricated [J.H.] from the vehicle; the fact that he and other officers kicked [J.H.] multiple times; the fact that other officers hit [J.H.] multiple times; or the fact that Walker (and then Kennedy) jerked [J.H.] up by the handcuffs. Rather, Walker simply stated that the officers had 'tuned him up' and Sgt. Cole asked no follow-up questions." Sergeant Cole testified at the hearing to express regret and accept responsibility for not asking follow-up questions during this conversation with the respondent.

During the evidentiary hearing, two investigators with the State Police's Professional Standards section, Lieutenant Kevin Smouse and Major Joe White, testified about their internal investigation of this matter and the factors that led to the respondent's discharge from employment. As part of their review, they considered whether the respondent had committed any of five different violations of State Police legislative regulations: failing to comply with State Police policy and procedure[5]; violating any law

---

[5] W. Va. Code R. § 81-10-11.3.2.1 (2008).

or engaging in criminal conduct[6]; using unnecessary force during an arrest/custody procedure[7]; committing conduct unbecoming a state police trooper[8]; and/or interfering with the rights of others.[9] Lieutenant Smouse concluded that the respondent's conduct was unbecoming an officer which, pursuant to State Police legislative rules on employee discipline, is "behavior of such a serious nature that a first occurrence would warrant the Superintendent discharging an employee."[10] Lieutenant Smouse believed that the other charges were "not sustained."[11]

However, Major White, the Director of Professional Standards for the West Virginia State Police with nearly twenty-four years of service with the State Police, testified to his conclusion that four of the five allegations had been sustained.[12] He did not believe that the respondent had committed a crime, but he concluded that the respondent's

---

[6] *Id.* § 81-10-11.3.3.19.

[7] *Id.* § 81-10-11.3.3.28.

[8] *Id.* § 81-10-11.3.3.33.

[9] *Id.* § 81-10-3.3.34.

[10] *See id.* § 81-10-11.3.3.33 (specifying that "committ[ing] conduct unbecoming" is a Group III offense for purposes of employee discipline); *Id.* § 81-10-11.3.3 (stating that "Group III Offenses . . . [are] acts and behavior of such a serious nature that a first occurrence would warrant the Superintendent discharging an employee.")

[11] "Not sustained" means that a charge is "not established by the evidence and can be neither proven nor disproved by the evidence available[.]" *Id.* § 81-10-7.8.2.

[12] "Sustained" means that "[t]he validity of the complaint has been established and proven by a preponderance of the evidence[.]" *Id.* § 81-10-7.8.1.

conduct was in violation of the other four regulations. Pursuant to these regulations, three of the four charges that Major White concluded were sustained are subject to immediate discharge from employment: conduct unbecoming a trooper, the use of unnecessary force, and interfering with the rights of others.[13] Major White testified to how he reached his conclusions, which included reviewing the witness statements and repeatedly watching the video for any act of aggression or resistance by J.H. Major White found no evidence of resistance that would justify the force used, and he saw no objectively reasonable justification for the respondent's conduct. Instead, Major White observed that both the respondent and Deputy Merson felt safe enough to get very close to J.H.'s car and the respondent did not feel the need to draw his weapon. The Major also saw that the respondent kicked J.H. twice and attempted to place his knee on J.H.'s head at a time when J.H.'s body was limp. Major White admitted that this was a "tough call[,]" and the respondent was less culpable than Trooper Kennedy, but he nonetheless found that the respondent's kicking of J.H., lifting J.H. only by the handcuffs, and failing to report Trooper Kennedy's actions to Sergeant Cole, were in violation of the regulations and were not objectively reasonable. After watching the video of the four officers handling a sixteen year-old juvenile who was small in stature and weight and who had just suffered "a horrific crash[,]" Major White determined that "instead of acting as first responders and caretakers, [the officers] essentially beat him up[.]" Accordingly, Major White had recommended to the superintendent that the respondent be discharged. Referencing the Major's demeanor

---

[13] *See supra* n. 10 (defining Group III offenses).

and the internal consistency in his testimony, the hearing examiner found that the Major's testimony was credible.

After reviewing the evidence, the hearing examiner concluded that the respondent's actions were not objectively reasonable under the circumstances; that excessive force had been used to remove J.H. from the car just after he had experienced a horrible car crash; that after J.H. was removed from his car and hit the ground he was not actively resisting or attempting to evade arrest; at that point in time, J.H.'s conduct did not pose an immediate threat to the safety of the respondent or the other officers; and that the respondent failed to fully disclose to Sergeant Cole the extent of the force used on J.H. The hearing examiner agreed with Major White's and Superintendent Cahill's assessment that the respondent had committed conduct unbecoming of a state trooper, had used excessive force, had failed to comply with State Police policy and procedures, and had interfered with J.H.'s rights. The hearing examiner concluded that the preponderance of the evidence supported the decision to terminate the respondent's employment.

The respondent appealed the grievance decision to the circuit court, which heard arguments of counsel and then reversed the hearing examiner's decision by order entered July 24, 2020. The circuit court devoted more than half of its twenty-one-page, single-spaced order, to making findings of fact. These findings include that the respondent and Deputy Merson pulled J.H. through the broken window to get him out of danger from the still-smoking car and because J.H. presented a danger to the officers' safety in that he

9

might have been in possession of a weapon. The circuit court found that the respondent delivered his first kick to J.H. because J.H. had pulled his right arm away from the respondent's attempt to handcuff him. As to the second kick, the circuit court characterized this as a "small, or half kick of no consequence to" J.H. that the court declined to second-guess. The circuit court dismissed the respondent's attempt to hoist J.H. to his feet by pulling only on his handcuffs because there is no policy forbidding such hoists and because, according to the circuit court's findings of fact, J.H. had been resisting arrest and J.H. engaged in braggadocio later at the hospital. Moreover, although the hearing examiner concluded that the respondent was looking at Trooper Kennedy when Kennedy threw J.H. to the side of the roadway, the circuit court credited the respondent's testimony that he was actually looking to the foreground at Deputy Merson. The circuit court also noted that Sergeant Cole accepted equal, if not more, responsibility for failing to ask clarifying questions of the respondent about the force the officers had used to "tune up" J.H.

Ultimately, the circuit court concluded that the hearing examiner's decision was clearly wrong and erroneous as a matter of law because the hearing examiner failed to give sufficient consideration to the severity of the crime J.H. had just committed, to whether J.H. posed an immediate threat to the officer's safety, and to whether J.H. was actively resisting arrest or attempting to evade arrest by flight. The circuit court answered each of these inquiries by concluding that the respondent's actions had been objectively reasonable. Finally, although the respondent had not raised the issue, the circuit court found that it was plain error for the hearing examiner to have referred to "urbandictionary.com"

10

to determine the meaning of "tune up." The circuit court concluded that the State Police had not established, by a preponderance of the evidence, that the respondent committed any violations of the legislative rules. The circuit court reversed the hearing examiner's decision and ordered the State Police to restore the respondent to his rank and active duty position, along with lost pay, benefits, and seniority. The court also awarded the respondent his attorney's fees up to a statutory limit.

## II. Standard of Review

This is the State Police's appeal of the circuit court's July 24, 2020, order reversing the decision of the State Police grievance hearing examiner. "On appeal of an administrative order from a circuit court, this Court is bound by the statutory standards contained in W. Va. Code § 29A-5-4(a) and reviews questions of law presented *de novo*; findings of fact by the administrative officer are accorded deference unless the reviewing court believes the findings to be clearly wrong." Syl. Pt. 1, *Muscatell v. Cline*, 196 W. Va. 588, 474 S.E.2d 518 (1996).[14] With this in mind, we turn to the parties' arguments.

---

[14] Pursuant to West Virginia Code § 29A-5-4(a) (2021) of the Administrative Procedures Act, any party adversely affected by a decision in a contested case may seek judicial review under chapter 29A. Subsection (g) of this same statute provides that

> The court may affirm the order or decision of the agency or remand the case for further proceedings. It shall reverse, vacate, or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decision, or order are:

11

## III. Discussion

The State Police argues that the circuit court erroneously disregarded the hearing examiner's findings of fact and credibility determinations, and instead, the circuit court substituted its own judgment for these matters. Furthermore, the State Police contends that the circuit court improperly emphasized J.H.'s conduct before and after the crash so it could craft a version of the facts in an effort to justify the respondent's use of force. According to the State Police, the circuit court improperly "re-tried this case on appeal." Conversely, the respondent argues that the circuit court properly disregarded the hearing examiner's findings of fact and credibility determinations because they were not supported by the evidence, were plainly wrong, and were based on information outside of the record. The respondent also contends that the circuit court correctly considered all of J.H.'s conduct to properly perform a use of force analysis. After carefully reviewing this matter, we conclude that the circuit court committed reversible error by substituting its findings for those of the hearing examiner.

---

(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority or jurisdiction of the agency;
(3) Made upon unlawful procedures;
(4) Affected by other error of law;
(5) Clearly wrong in view of the reliable, probative, and substantial evidence on the whole record; or
(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

*Id.*

In instances such as this, a circuit court serves as an appellate court charged with reviewing the decision of an administrative agency's factfinder. As such, the circuit court is required to accord deference to the hearing examiner's findings of fact unless they are "[c]learly wrong in view of the reliable, probative, and substantial evidence on the whole record[.]" *See* W. Va. Code § 29A-5-4(g)(5); *see also*, *Muscatell*, 196 W. Va. at 590, 474 S.E.2d at 520, syl. pt. 1 ("findings of fact by the administrative officer are accorded deference unless the reviewing court believes the findings to be clearly wrong"); Syl. Pt. 1, *Francis O. Day Co., Inc. v. Dir. of Env't Prot.*, 191 W. Va. 134, 443 S.E.2d 602 (1994) ("Evidentiary findings made at an administrative hearing should not be reversed unless they are clearly wrong."); Syl., *Billings v. Civil Serv. Comm'n*, 154 W. Va. 688, 178 S.E.2d 801 (1971) ("A final order of the Civil Service Commission based upon findings of fact will not be reversed by this Court upon appeal unless it is clearly wrong."); Syl. Pt. 1, *In Re Queen*, 196 W. Va. 442, 473 S.E.2d 483 (1996) ("An adjudicative decision of the Correctional Officers' Civil Service Commission should not be overturned by an appellate court unless it was clearly erroneous, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. Review under this standard is narrow and the reviewing court looks to the Civil Service Commission's action to determine whether the record reveals that a substantial and rational basis exists for its decision.").

"The 'clearly wrong' and the 'arbitrary and capricious' standards of review are deferential ones which presume the agency's actions are valid as long as the decision is supported by substantial evidence or by a rational basis." *Queen*, 196 W. Va. at 444, 473

13

S.E.2d at 485, syl. pt. 3. "'A finding is clearly erroneous if there is no substantial evidence in the record supporting it or, where there is evidence to support the finding, the circuit court reviewing the record is left with a definite and firm conviction that a mistake has been made.' *Bd. of Educ. of Cnty of Mercer v. Wirt*, 192 W. Va. 568, 579 n. 14, 453 S.E.2d 402, 413 n. 14 (1994)." *Powell v. Paine*, 221 W. Va. 458, 462, 655 S.E.2d 204, 208 (2007). Further elaborating on this deferential standard, this Court has held that

> [g]rievance rulings involve a combination of both deferential and plenary review. Since a reviewing court is obligated to give deference to factual findings rendered by an administrative law judge, a circuit court is not permitted to substitute its judgment for that of the hearing examiner with regard to factual determinations. Credibility determinations made by an administrative law judge are similarly entitled to deference. Plenary review is conducted as to the conclusions of law and application of law to the facts, which are reviewed de novo.

Syl. Pt. 1, *Cahill v. Mercer Cnty Bd. of Educ.*, 208 W. Va. 177, 539 S.E.2d 437 (2000).

Similarly,

> [a] reviewing court must evaluate the record of an administrative agency's proceeding to determine whether there is evidence on the record as a whole to support the agency's decision. The evaluation is conducted pursuant to the administrative body's findings of fact, regardless of whether the court would have reached a different conclusion on the same set of facts.

Syl. Pt. 1, *Walker v. W. Va. Ethics Comm'n*, 201 W. Va. 108, 492 S.E.2d 167 (1997). "[A] reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the [lower tribunal's] account of the evidence is

14

plausible in light of the record viewed in its entirety." Syl. Pt. 1, in part, *In Re Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

Just recently, this Court once again reiterated the importance of according deference to an administrative hearing examiner's findings of fact and determinations of witness credibility:

> Critically, it was the commission's job to "slosh" through the evidence in this case and to make findings of fact regarding the potential risk of harm that Sergeant Jarrell faced when arresting Mr. Hester. The commission held an evidentiary hearing and was in the best position to decide what happened, as well as to make determinations regarding witness credibility. On appeal, "a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the [lower tribunal's] account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, in part, *In Re Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996). "[I]f the Commission's findings are based on its assessment of the credibility of witnesses and if adequately explained and supported by the record, the findings will not be overturned unless they are hopelessly incredible or they flatly contradict either the law of nature or undisputed documentary evidence." *Queen*, 196 W. Va. at 447, 473 S.E.2d at 488.

*Jarrell v. City of Nitro*, 244 W. Va. 666, 673, 856 S.E.2d 625, 632 (2021) (footnote omitted).

The rationale behind the deference that is afforded to a hearing examiner's findings of fact and credibility determinations is that the hearing examiner personally heard the testimony and observed the witnesses' demeanor. *See, e.g.*, *Sims v. Miller*, 227 W. Va.

15

395, 402, 709 S.E.2d 750, 757 (2011) ("the hearing examiner who observed the witness testimony is in the best position to make credibility judgments."). "There are many critical aspects of an evidentiary hearing which cannot be reduced to writing and placed in a record, e.g., the demeanor of witnesses. These factors may affect the mind of a trier of fact in forming an opinion as to the weight of the evidence and the character and credibility of the witnesses." *Stephen L.H. v. Sherry L.H.*, 195 W. Va. 384, 395, 465 S.E.2d 841, 852 (1995) (superceded by statute on other grounds). In this case, the State Police hearing examiner not only watched the video of J.H.'s arrest, but he also listened to the respondent provide a running commentary describing the events in the video as the video was played; he observed the respondent giving his testimony; and he had the opportunity to ask clarifying questions. The hearing examiner was similarly able to observe the testimony and demeanor of all of the other witnesses and to ask questions. The circuit court, acting in its appellate role, did not have these advantages.

In this case, the hearing examiner made findings of fact and credibility determinations that he plausibly explained by citing supporting evidence from the record. The video shows the respondent forcefully pulling J.H. through the window of the crashed car and flinging J.H. several feet through the air onto the ground. The respondent testified that this was done to protect the officers' safety because there was a possibility that J.H. may have had a weapon. The hearing examiner rejected this explanation as lacking credibility because the respondent had not demonstrated any sign of being concerned for safety; from a review of the video, the hearing examiner found that the respondent had

16

simply stood next to the car and had not drawn his weapon. The hearing examiner found that "[i]n light of the fact that [J.H.] had just experienced a horrific crash and Walker's action did not evidence concern for a potential attack from [J.H.], it is clear that the force used in this instance was excessive."

Furthermore, the respondent testified that the two times he kicked J.H. were "compliance strikes" administered in response to J.H.'s resistance to the application of the handcuffs. The hearing examiner rejected this explanation, observing no evidence of resistance at that time. The hearing examiner explained that although J.H. "had squirmed momentarily on the ground, he was quickly surrounded by two Sheriff's deputies and two State Troopers who easily overpowered him." It was after the four officers had already overpowered J.H., who was lying face down on the ground, that the respondent kicked the juvenile twice and the other officers administered their kicks and punches.

The hearing examiner also found that the respondent failed to report to Sergeant Cole the degree to which the officers had "tuned [J.H.] up"—especially Trooper Kennedy, who had tossed the handcuffed juvenile to the side of the road. The hearing examiner found that the respondent "provided some indication to Sgt. Cole that some physical altercation had occurred, [but] it hardly caputure[d] the *very recent and extraordinary events at issue.* Remarkably, Walker fail[ed] to mention Kennedy's actions, which, by any estimation, would warrant a report." Although the respondent claims that he

did not see Trooper Kennedy throwing the juvenile, the hearing examiner found that the video depicts the respondent looking in that very direction.[15]

None of these findings of fact and credibility determinations were "clearly wrong" or "hopelessly incredible," and they did not "flatly contradict either the law of nature or undisputed documentary evidence." *See*, *Tiffany Marie S.*, 196 W. Va. at 226, 470 S.E.2d at 180, syl. pt. 1; *Muscatell*, 196 W. Va. at 590, 474 S.E.2d at 520, syl. pt. 1; *Queen*, 196 W. Va. at 447, 473 S.E.2d at 488. The hearing examiner explained his reasoning and cited to specific evidence in the record in support of the findings. Although another hearing examiner or judge might have decided differently, these findings of fact and credibility determinations are nonetheless "plausible in light of the record viewed in its entirety" and should have been affirmed. *See Tiffany Marie S.*, 196 W. Va. at 226, 470 S.E.2d at 180, syl. pt. 1. Instead, the circuit court conducted an independent review of the video and made its own findings of fact and credibility determinations that were exactly the opposite of what the hearing examiner had found. The circuit court found the

---

[15] The circuit court's order also found plain error because the hearing examiner had, in a footnote in the decision, referred to an internet urban dictionary to determine the meaning of the phrase "tuned up." This issue is a red herring. The point is that the respondent failed to fully inform Sergeant Cole of the amount of force used. In the respondent's own testimony, he defined "tuned him up" as vernacular used to indicate that officers had to lay hands on a perpetrator. However, simply laying hands on a perpetrator does not adequately convey that the officers had administered eight kicks and eleven punches to a juvenile who had just suffered a terrible car crash, and then one of the officers threw the handcuffed juvenile to the side of the road. We are not convinced that it was error for the hearing examiner to have referred to the urban dictionary, but even assuming, arguendo, that it was error, it was harmless.

respondent's explanations to be entirely credible, while dismissing Major White's reasons for recommending termination.

Our recent opinion in *Jarrell v. City of Nitro* is remarkably similar to the current appeal, including that an alleged act of police excessive force was captured on a video recording and the officer was terminated from his employment for using that force. *Jarrell*, 244 W. Va. 666, 856 S.E.2d 625. In *Jarrell*, the hearing examiner found that the officer's use of force was justified because the person who was being arrested was a larger man of perceived strength, the officer testified that the man pumped his fist and leaned forward, and the officer reasonably perceived a threat of personal injury to himself. *Id.* at 671, 856 S.E.2d at 630. On appeal, the circuit court independently reviewed the video of the arrest, concluded that the force was excessive, and reversed. *Id.* at 671-72, 856 S.E.2d at 630-31. The circuit court saw no indication from the video that the man had pumped his fist, leaned forward, or did anything to resist arrest. *Id*. We acknowledged that the circuit court's concern about the use of force was not without basis, and that if this Court had been the finder of fact, we might have ruled differently than the hearing examiner. *Id.* at 674, 856 S.E.2d at 633. Nonetheless, we held that because the hearing examiner's findings of fact and credibility determinations were plausible, those findings had to be given deference. *Id.* Accordingly, we reversed the circuit court and ordered that the administrative order be reinstated. *Id.*

19

Seeking to justify its ruling in this case, the circuit court found that the hearing examiner failed to adequately consider the "objective reasonableness" standard for the use of police force that is discussed in *Graham v. Connor*, 490 U.S. 386 (1989), and other cases. The United States Supreme Court explained in *Graham* that the objectively reasonable standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396 (citations omitted). The circuit court believed that the hearing examiner failed to account for the severity of J.H.'s pre-crash conduct—rear-ending the deputy's cruiser and then leading the officers on the extremely dangerous car chase—which the circuit court speculated amounted to criminal malicious or unlawful assault and reckless fleeing from police.[16] And, as set forth above, and contrary to the hearing examiner's findings of fact, the circuit court found that J.H. did present a potential danger to the officers' safety and did resist arrest.

After reviewing the record on appeal, we conclude that the hearing examiner did consider and correctly apply the objective reasonableness standard. First, the record contains extensive evidence about J.H.'s pre-crash conduct, including the video recording of the car chase and the respondent's testimony describing the car chase. Moreover, Major

---

[16] There is no indication in the appellate record that J.H. was ever charged with a crime.

White testified about the State Police's policy on the use of force, and this policy essentially mirrors the quote from *Graham*, above. In his decision, the hearing examiner analyzed this issue as follows:

> [I]t is beyond cavil that [J.H.]'s actions placed Walker, his colleagues and the public at risk. [J.H.]'s conduct up to and including the crash appears to be without defense.
>
> However, when [J.H.]'s vehicle came to a stop after the horrific crash that occurred and it became apparent that [J.H.] was not a threat to flee or harm the officers on the scene, it was incumbent upon Walker and his colleagues to be in control of their actions and act as first responders. This is particularly true given the absence of any meaningful resistance by the 120 lb [J.H.]; the fact that he had just experienced a horrific car crash; and the presence of four law enforcement officers to handle the five foot four inch sixteen year old. Yet, this never occurred.

Essentially, the hearing examiner determined that *at the time the force was applied*, there was no need for this level of force. The hearing examiner's analysis is consistent with a later Supreme Court discussion that offered a more extensive, non-exhaustive list of things that may be considered when weighing the objective reasonableness of a police officer's actions:

> "Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. [] We do not consider this list to be exclusive. We mention these factors only to illustrate the types of objective circumstances potentially relevant to a determination of excessive force. *Kingsley* [*v. Hendrickson*, 576 U.S. 389, 397], 135 S.Ct. [2466], 2473[, 192 L.Ed.2d 416]

21

> [(2015)] (citation omitted)." *Maston v. Wagner*, 236 W. Va. 488, 504, 781 S.E.2d 936, 952 (2015).

*Jarrell*, 244 W. Va. at 673, 856 S.E.2d at 632.[17] Thus, while the circuit court disagreed with the hearing examiner's factual findings on the lack of a need for this level of force, those findings were not clearly wrong or arbitrary and capricious.[18]

Having reviewed the record and the parties' arguments, we conclude that the circuit court impermissibly substituted its judgment for that of the hearing examiner, who was the factfinder in this manner. Even though the circuit court or this Court may have decided the case differently, the circuit court should have affirmed the decision because the hearing examiner's account of the evidence is plausible in light of the record viewed in its entirety. Accordingly, we must reverse.

---

[17] The United States Supreme Court in *Kingsley* considered "whether, to prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officers' use of that force was *objectively* unreasonable." 576 U.S. at 391. The Court held that it was an objective test. *Id.*

[18] Additionally, when finding that the use of force was justified, the circuit court discussed a statement that J.H. gave to a different law enforcement officer later that night while at the hospital. In a braggadocio manner, the teenager said something like, "it was a good thing there were a bunch of cops because if it was just one on one he [J.H.] could've taken them." The circuit court also noted that marijuana was later found in J.H.'s car and it was suspected that J.H. was using and possibly selling marijuana. However, these things were not known at the time the force was used and have no bearing on whether the force was reasonable.

## IV. Conclusion

For the foregoing reasons, the circuit court's July 24, 2020, order is reversed. We remand this case to the circuit court for the entry of an order reinstating the September 30, 2019, decision of the West Virginia State Police Grievance System hearing examiner.

Reversed and Remanded.